UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| ABRO INDUSTRIES, INC., | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | CAUSE NO. 3:14-cv-1984-TLS-MGG |
| | ) | |
| 1 NEW TRADE, INC., IGOR | ) | |
| ZORIN, BORIS BABENCHIK, and | ) | |
| VADIM FISHKIN, | ) | |
| | ) | |
| Defendants, | ) | |
| _____ | ) | |
| 1 NEW TRADE, INC., IGOR ZORIN, | ) | |
| BORIS BABENCHIK, | ) | |
| | ) | |
| Counter-Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ABRO INDUSTRIES, INC., | ) | |
| PETER BARANAY, | ) | |
| | ) | |
| Counter-Defendants. | ) | |

BRIEF IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT ON ALL COUNTERCLAIMS

ABRO Industries, Inc. ("ABRO"), by its attorneys, submits this brief in support of its

motion for summary judgment on all counterclaims asserted by 1 New Trade, Inc. ("1 New

Trade"), Igor Zorin ("Zorin"), and Boris Babenchik ("Babenchik"). The six-count counter

complaint asserts claims for breach of fiduciary duty asserted by both Zorin and Babenchik,

individually (Counts 1 and V, respectively), breach of contract asserted by both Zorin and

Babenchik (Counts II and VI, respectively), and tortious interference asserted by Zorin,

Babenchik and 1 New Trade, seeking both damages and injunctive relief (Counts III and IV,

respectively). [Doc. 23.] As shown below, in each instance the counterclaimants will be unable

to prove an essential element of their claims, making summary judgment appropriate on the entirety of the counterclaim.

## ARGUMENT[1]

**I.      Counts I and V should be dismissed because neither Zorin nor Babenchik can establish a fiduciary relationship or a breach of that relationship.**

A claim for breach of fiduciary duty requires the proof of three elements:  (1) the existence of a fiduciary relationship, a breach of the duty owed by the fiduciary to the beneficiary, and a harm to the beneficiary.  *York v. Fredrick*, 947 N.E.2d 969, 978 (Ind. Ct. App. 2011).  Contractual agreements do not give rise to a fiduciary relationship creating a fiduciary duty.  *Morgan Asset Holding*, 736 N.E.2d at 1273, citing *Comfax Corp. v. North American Van Lines, Inc.*, 587 N.E.2d 118, 125-26 (Ind. Ct. App. 1992).  Although not entirely clear from the pleading, Zorin and Babenchik are attempting to claim they each were part of a "lifetime partnership" with ABRO, a relationship which, if it existed, gives rise to a fiduciary relationship as a matter of law.  [*See* Doc. 23, at ¶¶ 24, 26; *Ruse v. Bleeke*, 914 N.E.2d 1, 11 (Ind. Ct. App. 2009).  "The fiduciary duty between partners requires each partner to exercise good faith and fair dealing in partnership transactions and toward co-partners."  *Ruse*, 914 N.E.2d at 11.

### A.      ABRO did not form a partnership with either Zorin or Babenchik.

A partnership is an association of two or more persons to carry on a business for profit as co-owners.  Ind. Code § 23-4-1-6.  While the receipt of a share of the profits of a company is *prima facie* evidence of a partnership, the sharing of gross income does not establish a

---

[1]      ABRO submits its Local Rule 56.1 Statement of Material Facts herewith as part of its appendix in accordance with the Rule.  Also submitted herewith is a separate motion for summary judgment and brief in support on behalf of Peter Baranay ("Baranay"), seeking dismissal of the claims in the Third-Party Complaint.  Baranay's brief includes a Standard of Review that applies equally in to ABRO's summary judgment motion.  It is provided in Baranay's brief for the benefit of the parties, as the Court is well familiar with this standard.

partnership.  Ind. Code § 23-4-1-7; *J.M. Schultz Seed Co. v. Robertson*, 451 N.E.2d 62, 64 (Ind. Ct. App. 1983).  To be a partner, one must have an interest with another in the profits of a business, as profits.  There must be a voluntary contract to carry on a business with the intention of the parties to share the profits as common owners thereof." *Vohland v. Sweet*, 433 N.E.2d 860, 864 (Ind. Ct. App. 1982)(quoting *Bond v. May*, 78 N.E. 260 (1906)).

In *Life v. F.C. Tucker Co., Inc.*, 948 N.E.2d 346 (Ind. Ct. App. 2011), the Indiana Court of Appeals discussed the importance of a sharing of gross *profits* versus gross returns under Indiana Code section 23-4-1-7.  Home Link is a company affiliated with F.C. Tucker that provides customers "direct access to various retailers/service suppliers."  948 N.E.2d at 349. Home Link entered into a marketing agreement with Maintenance One Services Co., under which Home Link would promote Maintenance One's services and Maintenance One would pay Home Link an annual fee of $3000 and five percent of the total gross bill before taxes for all services rendered to customers of the Home Link program.  *Id.*  In finding on summary judgment that there was no partnership between Home Link and Maintenance One, the Court of Appeals emphasized that these companies "agreed to share returns, not profits." *Id.* at 352.  "The clause indicates nothing about also sharing in Maintenance One's losses, and on its face it appears that Tucker receives its fee regardless of whether Maintenance One profits from constructing homes. This arrangement falls short of 'co-ownership' or a 'community of profits' exhibited in a partnership." *Id.*, citing *Kamm & Schellinger Co. v. Likes*, 179 N.E.23, 25 (1931).

"It is an established common law principle that a partnership can commence only by the voluntary contract of the parties." *Vohland v. Sweet*, 433 N.E.2d 860 (Ind. Ct. App. 1982)(quoting *Bond v. May*, 78 N.E. 260 (1906).  "Essential to the formation of a partnership is a contract, either express or implied." *J.M. Schultz Seed Co.*, 451 N.E.2d at 65, citing *Kavanaugh*

3

*v. England*, 110 N.E.2d 329 (Ind. 1953). "The intention to form a partnership is determined by examining all the facts of the case and the conduct of the parties." *Weing v. Weinig*, 674 N.E.2d 991, 995 (Ind. Ct. App. 1996). "[I]t is the substance, and not the name of the arrangement between them which determines their legal relation toward each other." *Driscoll v. Sullivan*, 186 Ind. 178, 115 N.E. 331, 332-33 (1917).

ABRO is a private label manufacturer of automotive parts and supplies and consumer hardware goods with a worldwide distribution network. ABRO's President Baranay testified unequivocally that he has no partners and never has had any. In their complaint, Zorin and Babenchik allege a "lifetime partnership" with ABRO for the distribution of ABRO products in Russia. But, neither Zorin nor Babenchik has established the requisite agreement to share in the profits and losses of a business as required to establish a partnership.

### A.      Zorin cannot establish a partnership.

Zorin admits that his relationship with ABRO began in 1994 as a distributorship relationship in which certain companies in which he had an ownership interest – such as Sadovy Dom, JSC Himavtoprom[2], Avtobythim, and Aerograf, were buying product from ABRO and reselling the product. [App. 5, Zorin Dep. at 27-32, 109.] Zorin (or the companies he jointly owned) kept all the profits from such sales and paid ABRO for the wholesale cost of the product. [App. 5, Zorin Dep. at 27-32; *see also* App. 5, Zorin Dep. at 25 ("[I]n the profits and losses in the business in Russia, Peter [Baranay] was not involved. It was me purchasing the goods, paying for it, and then selling it in Russia, so losses and profits [ ] in Russia are all mine.").] Thereafter, Zorin contends that the relationship morphed into a partnership between him and ABRO as he

---

[2]      These were not sole proprietorships. The JSC stands for Joint Stock Company, a form of Russian entity. [App. 5, Zorin Dep. at 117.] Co-owners of Aerograf are Serge Kustionkov, and Serge Petrov. [App. 5, Zorin Dep. at 109.] Avtobythim was co-owned by Eino Loukkonen and others. [App. 5, Zorin Dep. at 114.]

4

agreed "to build big business of ABRO sales in Russia, to promote it, to explore all possibilities, to invest a lot of money in it and, as a result to gain a lot of money as well." [App. 5, Zorin, Dep. at 35.]

Zorin testified that he created a company for the sale of ABRO products called ABRO Rus. Although he testified that Baranay "approved" the creation of this company for Zorin's sale/distribution of ABRO products in Russia, neither Baranay nor ABRO ever received any share of the profits from Zorin's company ABRO Rus. [App. 5, Zorin Dep. at 90-91; App. 3, Baranay Decl. at ¶ 7.] Zorin described the "terms of the partnership" as setting a mutual goal to reach certain sales targets for sales of ABRO goods in Russia by the year 2017. Zorin describes the nature of the relationship as requiring ABRO to develop and ship products, while he (and Babenchik) would assist by developing new products, advertising, and seeking new distributors to fill potential new markets in Russia. [App. 5, Zorin Dep. at 36-37.][3]

The key missing factor, however, is any evidence of "an intention of the parties to share the profits as common owners" as required to form a partnership. Zorin admits that he was compensated for his efforts related to growing sales of the ABRO brands in Russia in two ways: (1) his 40-percent margin on his own companies' sales of ABRO products; and (2) a 3-percent

---

[3] Zorin and Babenchik both describe the relationship as encompassing multiple "partnerships," namely their individual arrangements with ABRO and a mutual agreement between both of them and ABRO. [App. 5, Zorin Dep. at 175-76; App. 6, Babenchik Dep. at 27-28.] More confusingly, they actually attribute the relationships to Baranay personally, as compared to with ABRO, although no breach of fiduciary duty claim is asserted against Baranay in the Third Party Complaint. [App. 5, Zorin Dep. at 175-76; App. 6, Babenchik Dep. at 27-28.] Because there is no evidence of any partnership in this case, the question of whether there was one agreement, multiple agreements, and between what parties, is immaterial for summary judgment purposes. However, the varying ways in which Zorin and Babenchik describe the purported partnerships compared to each other and in contrast to their own pleadings demonstrates the lack of a meeting of the minds and an intent to form any partnership.

commission on Russian sales.[4]  [*See, e.g.*, App. 5, Zorin Dep. at 37, 164, 176-79; *see also* App. 4, Baranay Dep. at 20; App. 2, Molnar Dep. at 56-59.]  The first of these is consistent with the arrangement Zorin acknowledged was *not* a partnership – simply, him buying product from ABRO, reselling it and keeping the profits from those sales.  [App. 5, Zorin Dep. at 25, 27-32.]

The second involved commissions paid into an account maintained in Zorin's name by ABRO and dispersed according to his instructions, which varied from paying his daughter's private school tuition, transferring into a personal account, or paying off his accrued balance for goods purchased from ABRO.  [App. 4, Baranay Dep. at 137; App. 2, Molnar Dep. at 60; App. 5, Zorin Dep. at 143-44, 182; App. 3, Baranay Decl. at ¶ 9.]  The agreement to pay Zorin a commission on all Russian sales did not transform the relationship into a legal partnership because it is not an agreement to share in the profits and losses of a business.  This arrangement represents a sharing in returns or sales without regard to profitability just like the one considered in *Life v. F.C. Tucker*.  A commission arrangement "falls short of 'co-ownership' or a 'community of profits' exhibited in a partnership."  948 N.E.2d at 352, citing *Kamm & Schellinger Co. v. Likes*, 179 N.E.23, 25 (1931).  To hold otherwise would be to convert every commission contract into a legal partnership.

Zorin also testified that as part of his efforts to expand ABRO's sales in Russia, he would introduce to ABRO new distributors for potential new markets, and that he would act as guarantor of those distributors' payments to ABRO.  Zorin never actually had to pay for another distributor's default in payment to ABRO; and his commission account with ABRO would have fallen far short of being able to satisfy the product cost and ABRO's profit on any such sale to a distributor, leaving ABRO with no assets to satisfy the guaranty.  [App. 4, Baranay Dep. at 122;

---

[4]      Commissions Zorin earned on sales of products shipped from somewhere other than the United States were slightly lower at 1.5-percent.

*see also* App. 3, Baranay Decl. at ¶ 8.]   Nevertheless, the offer of a guaranty on distributor payments is, again, not an agreement to share in profits or losses of a business.

Finally, Zorin suggests that ABRO created a partnership with him by reference by referring to him as his "partner in Russian business, who is responsible for all business in Russia" and using the term, "the ABRO family in Russia."   [App. 5, Zorin Dep. at 40, 48, 57-60.]  As a matter of law, the substance of the parties' relationship, not the name applied governs whether a partnership exists.   *Driscoll*, 115 N.E. at 332-33.  Where the requisite intent to share profits and losses in co-ownership of a business is lacking, alleged use of the term "partner" in a lay sense from time to time to describe the relationship cannot transform the parties' legal relations.  Moreover, even Zorin admits that ABRO referred generally to other distributors in other countries and other business relationships as part of "the ABRO family," in general, but acknowledges the use of this term to include "every person who sells ABRO all over the world," did not refer to a legal partnership among him and all ABRO distributors worldwide.  [App. 5, Zorin Dep. at 48-69.][5]  Indiana courts have recognized that the use of the term "partner" does not establish a partnership. *Broadway Radiology Servs. v. Tricou*, 725 N.E.2d 435, 441 (Ind. Ct. App. 2000)("Even if all of the hearsay evidence suggesting that contracting doctors were referred

---

[5]    Similarly, exaggerates the importance of the term the "ABRO family" when it suits his purposes of trying to establish a fiduciary relationship and then downplays its importance when the term would not support his claim.  Babenchik described his understanding of the term "ABRO family" to mean the "community or togetherness of people who promote ABRO all over the world," but testified that he understood the term "ABRO family in Russia" to have a different meaning depending on whether being used in a conversation among him, Zorin and Baranay, in which case it referred to the alleged three-way partnership, or used in conversation with a large group of Russians present, in which case it meant the "community of many people."  [App. 6, Babenchik Dep. at 167-69.]

18929440.3

to as 'partners' were admissible, which we do not decide here, it does not suffice to refute the overwhelming evidence that BRS was not a partnership as that term is legally defined.").[6]

Zorin cannot show ABRO's intent to form a legal partnership. Where no other fiduciary relationship is alleged, Zorin's claim for breach of fiduciary duty fails as a matter of law.

### B.       Babenchik cannot establish a partnership.

Babenchik's attempts to establish a partnership relationship fail for all of the same reasons described above in the discussion of Zorin's relationship.  Babenchik's claim for breach of fiduciary duty is further flawed insofar as the relationship he describes is really a relationship between ABRO and NPTK Krepost ("Krepost"), a Russian company in which he was an owner, and *not* between Babenchik and ABRO (or Babenchik and Baranay, as Babenchik alleges).

Babenchik alleges a partnership between himself and Baranay and alleges a "secondary partnership" between himself and Zorin and Baranay.  [App. 6, Babenchik Dep. at 28.]  He describes the terms of this alleged partnership as follows:  "I would bring a new client, a new distributor on the territory of Russia and depending on how much of ABRO product this distributor would buy, I was receiving a commission or compensation . . . .  I was receiving compensation based on the size of the purchase of the client I would bring to Mr. Baranay." [App. 6, Babenchik Dep. at 28-29; *see also* App. 6, Babenchik Dep. at 30. ("I was told and we agreed that depending on who much product the distributor buys, I will be paid a certain percentage as my compensation.").]  Specifically, Babenchik alleges that he and ABRO agreed to payment of a 10-percent commission for sales to the Kaliningrad distributor, Orient Invest,

---

[6]       Steven Hughes from Quest similarly used the term "partnership" in its lay sense when he wrote to Zorin in an email on November 11, 2013 that he was "looking forward to forming a nice partnership."  [App. 20, Deposition Ex. 226.]  Quest's company representative disclaimed any intent by Quest to form a legal partnership with Zorin, and Zorin is not claiming a partnership with Quest based on the use of this term.

8

with an understanding that with respect to any other distributors in the future, they "were going to sit down and discuss." [App. 6, Babenchik Dep. at 36, 170.] In addition, Babenchik described an agreement to pay a 5-percent commission for sales to a distributor in Kazakhstan, but says to help develop the business in that area, he suggested that those commissions not be paid. [App. 6, Babnechik Dep. at 37.]

Additional terms of the relationship Babenchik describes are: (a) his guaranty of payments by distributors he introduced; (b) assisting distributors with advertising, certificates required and the best mix of products; and (c) advertising and promoting the ABRO brands. Babenchik defined "partnership" as "everything that goes along with [him] promoting, [him] personally promoting the [ABRO] product." [App. 6, Babenchik Dep. at 118-19.] In short, like Zorin, Babenchik has described a commission agreement with payments made based on sales, not profitability. Wholly absent from this relationship was any agreement to share in the profits and losses of the business as co-owners that is essential to establishing a partnership.

However, while Babenchik refers to oral agreements between him and Baranay as individuals, he admits that the commissions for sales to the Kaliningrad Distributor (Orient Invest) were paid to Krepost against the Krepost account with ABRO. [App. 6, Babenchik Dep. at 228-29.] Other evidence substantiates that the commission arrangement was with Krepost, not Babenchik individually. [App. 7, Deposition Ex. 40, App. 8, Deposition Ex. 41, App. 9, Deposition Ex. 44; App. 2, Molnar Dep. at 127-28; App. 3, Baranay Decl. at ¶ 15.] Although Babenchik claims to see no difference between himself as an individual and Krepost as a company,[7] this claim is belied by Babenchik's recognition that when he decided to leave Krepost

_____

[7]     Babenchik and Zorin continually conflate the companies involved in this relationship with their principals. They continually refer to Baranay interchangeably with ABRO. And, Zorin, when asked in reference to an October 1995 meeting in South Bend whether he was there

18929440.3

(and thereby terminate his association with ABRO), the relationship between ABRO and Krepost continued until later terminated in 2016.  [App. 18, Deposition Ex. 45.][8]

Babenchik cannot establish an agreement between himself and ABRO for the sharing of profits and losses.  In fact, he cannot establish an agreement with him personally, as compared to Krepost, for any purposes.  Because the alleged partnership cannot be proven, there is no fiduciary relationship, and Babenchik's claim for fiduciary duty must be dismissed.

## II.   Counts II and VI should be dismissed because neither Zorin nor Babenchik can prove the required elements for breach of contract.

It is well settled that to recover for breach of contract, a plaintiff must prove that:  (1) a valid contract existed between the parties; (2) the defendant failed to perform its part of the contract; and (3) the plaintiff was damaged by the defendant's breach.  *Strong v. Commercial Carpet Co., Inc.*, 163 Ind. App. 145, 322 N.E.2d 387, 391 (Ind. Ct. App. 1975).  A party breaches a contract when it fails to perform all the obligations which it has agreed to undertake. *Worrell v. WLT Corp.*, 653 N.E.2d 1054, 1057 (Ind. Ct. App. 1995).

ABRO maintains that its relationships with Zorin and Babenchik's company, Krepost, were purchase-order driven relationships for orders placed from time to time.  Zorin and Babenchik each plead an on-going contractual relationship that bound ABRO to continue their distributorship relationship.  Each alleges that ABRO committed a breach by discontinuing their relationship. For purposes of summary judgment it does not matter whether the parties'

---

on behalf of himself personally or his company, responded:  "I don't see the differences. . . . I represent the company; the company is part of me.  I don't see the difference."

[8]      Although Babenchik wrote to ABRO announcing his departure from Krepost, the evidence shows that he never actually severed that relationship.  While irrelevant to the legal issues on summary judgment, this lack of candor is inconsistent with Babenchik's claim here of a fiduciary relationship with ABRO.

relationships were purchase-order driven or oral agreements for long-term sales and distribution. Zorin's alleged contract is unenforceable under the applicable statute of frauds.  And, the open-ended relationship Babenchik alleges is, as a matter of law, terminable at will.

### A.     Zorin's alleged agreement that ABRO would continue to ship goods for distribution and pay commissions until October 2017 is unenforceable under the Statute of Frauds.

Zorin's claim for breach of contract alleges that ABRO agreed to continue to ship goods to Russia as directed by him and to pay him a three percent commission on sales all sales in Russia from approximately 2007 through October 2017. [Doc. 23, at ¶ 42.] The alleged contract cannot be performed within one year from the making of the agreement.  As such, in the absence of a writing signed by ABRO containing the essential terms of this agreement, Zorin's alleged contract is unenforceable by operation of the applicable Statute of Frauds.

Indiana Code 32-21-1-1(b) provides a "person may not bring . . . [a]n action involving any agreement that is not to be performed within one (1) year from the making of the agreement," *unless* "the promise, contract, or agreement on which the action is based, or a memorandum or note describing the promise, contract, or agreement on which the action is based, is in writing and signed by the party against whom the action is brought or by the party's authorized agent."  Ind. Code § 32-21-1-1(b)(5).  "[A]n agreement required to be in writing must completely contain the essential terms without resort to parol evidence in order to be enforceable."  *Reich v. Lincoln Hills Christian Church, Inc.*, 888 N.E.2d 239, 243 (Ind. Ct. App. 2008), quoting *Schuler v. Graf*, 862 N.E.2d 708, 713 (Ind. Ct. App. 2007).  Where the Statute of Frauds applies, "parol evidence may not be relied upon to provide the essential terms of a document."  *Schuler*, 862 N.E.2d at 713; *see also National By-Products, Inc. v. Ladd*, 555

11

N.E.2d 518, 520 (Ind. Ct. App. 1990)("written contract which leaves some essential term thereof to be shown by parol, is only a 'parol contract' not enforceable under the Statute of Frauds.")

The first required element for a breach of contract claim is the existence of a valid and enforceable contract.  Zorin  cannot provide this Court with any writing providing the essential terms of an agreement between him and ABRO to continue shipping product for distribution and to continue paying a three-percent commission thereon through October 2017.  While there are writings demonstrating that a commission was paid, there is no writing establishing an agreement to continue the relationship until at least October 2017.  In the absence of such a writing, the term of the contract can be stablished (if at all) only with parol evidence.  As a matter of law, Zorin's alleged contract is unenforceable, and his breach of contract claim must be dismissed.[9]

**B.      Babenchik cannot establish that ABRO breached any agreement with him.**

Babenchik's breach of contract claim is flawed in many ways. In essence, Babenchik's claim is that ABRO agreed to ship product to Krepost for resale, and to pay him a ten-percent commission on those sales.  Babenchik's breach of contract claim is founded on his belief that ABRO "unilaterally and without good and just reason," terminated its agreements with him.  He alleges the termination damaged him in the form of lost profits. Again, there is no alleged written contract. [App. 6, Babenchik Dep. at 122 ("there was an oral understanding that the product will be sent, shipped by ABRO to me or to the companies I would name.").]

As an initial matter, ABRO had no agreement with Babenchik, individually.  To the extent that ABRO had any agreement, it was with Krepost, a company in which Babenchik was

---

[9]      To the extent that Babenchik is also alleging that his purported agreement with ABRO was to continue through 2017, his claim would also be barred by operation of the Statute of Frauds.  However, as shown below, Babenchik's claim seems to be stated in terms of an open-ended continuing relationship.

one of several owners. Although Babenchik alleges an agreement with him personally, the undisputed evidence in this case shows solely a relationship between ABRO and Krepost. For example, in a communication made on behalf of Babenchik, his sister Tatiana Chumakova wrote: "As you may know, KREPOST brought to ABRO the Kaliningrad dealer – Orient Invest. We had an agreement with Peter [Baranay] that KREPOST gets 10% commission for their orders and t[h]at we control there their business with ABRO." [App., 8, Deposition Ex. 41; *see also* App. 7, Deposition Ex. 40 (Krepost's Statement of Account reflecting both the open invoices and the application of commissions to Krepost's account); App. 9, Deposition Ex. 44 (recognizing ABRO's 20 year business relationship with Krepost).] Thus, there is a significant question as to whether Babenchik has standing to pursue a claim against ABRO based on the alleged termination of the sales and commission agreement.

Regardless, the alleged agreement was terminable at will. "[A] contract providing for continuing performance and which has no termination date, or which provides that it will last indefinitely, is terminable at will by either party." *Marksill Specialities, Inc. v. Barger*, 428 N.E.2d 65, 69 (Ind. Ct. App. 1981), citing *House of Crane v. Fendrich*, 146 Ind. App. 478, 256 N.E.2d 578 (1976); *see also Rogier v. American Testing & Eng'g Corp.*, 734 N.E.2d 606, 616 (Ind. Ct. App. 2000)(contract which is silent as to term or which lasts indefinitely is terminable at will). As this Court has held, "such a contract is enforceable until terminated, but there is no liability for the termination itself." *Black Agents & Brokers Agency, Inc. v. Near North Ins. Brokerage, Inc.*, Case No. 2:01 CV 419 PS, 2004 U.S. Dist. LEXIS 17945, *22 (N.D. Ind. June 7, 2004), citing *House of Crane*, 256 N.E.2d at 579. Applying this concept in *Black Agents & Brokers Agency*, this Court held: "without a termination date, any agreement between BABA and NNIB was terminable at will and therefore there was no breach by NNIB when it chose to

discontinue its relationship with BABA in the summer of 2000.   Thus BABA's claim against NNIB for breach of contract fails as a matter of law as well."   *Id.*

*House of* Crane, the landmark Indiana decision which established this principal of law almost half a century ago, bears significant resemblance to the case before this Court.   Beginning in 1905, Crane distributed a brand of cigar manufactured by defendant Fendrich in Indianapolis and Evansville.   Thereafter, Crane "undertook to distribute a second brand manufactured by Fendrich and after many years of concentrated effort in promotion, Crane succeeded in establishing that particular brand as a sales leader."   256 N.E.2d at 578.   By January 1960, Fendrich had assigned to Crane exclusive sales privileges for Fendrich brand cigars in 74 Indiana counties, 24 Illinois counties and 18 Kentucky counties.   *Id*.   Crane undertook to use its best efforts to achieve the maximum sales of Fendrich's products in the territory; establish and maintain a system of distribution in the territory for Fendrich's products; assume all credit risks on the accounts to which it sold the Fendrich's products; and to conduct sales promotion contests, consumer sampling, and display promotion.   *Id.*   But, as in this case, circumstances changed and Crane took issue with Fendrich's "unwarranted" actions, including permitting and encouraging other distributors in Crane's territory and selling products directly to large drugstore chains.   *Id.* at 579.   Crane admitted that the agreement did not specify a definite time or prescribe conditions that would determine the duration of the contract.   *Id*. at 579   In the absence of a prescribed term, the contract was terminable at will, and the Indiana Court of Appeals affirmed judgment in Fendrich's favor on Crane's claim.

Babenchik claims he had an "oral agreement whereby ABRO was obligated to ship product as long as I asked for it, and I would in turn promote ABRO products over the entire territory of Russia."   [App. 6, Babenchik Dep. at 122-23.]   He believed ABRO was required to

continue this relationship, indefinitely, so long as he continued to want the arrangement to work. [App. 6, Babenchik Dep. at 124.] Babenchik admits he and ABRO never discussed the "term" of the contract, or how long it would last. [App. 6, Babenchik Dep. at 129 ("We never discussed the time other than in terms – other than in terms of ABRO expressing readiness in the near future to keep supplying with product either me or my company.").] Babenchik contends ABRO breached this contract of indefinite term by "unilaterally and without good and just reason" terminating shipments to the Kaliningrad distributor, thereby terminating Babenchik's commissions for those sales, and later by terminating shipments to Krepost. In light of the unmistakable and undisputed lack of a definite term in the alleged agreement between ABRO and Babenchik, any agreement between them was terminable at will. And, as this Court held in *Black Agents & Brokers Agency*, "without a termination date, any agreement between [Babenchik] and [ABRO] was terminable at will and therefore there was no breach by [ABRO] when it chose to discontinue its relationship with [Babenchik] . . . . Thus [Babenchik's] claim against [ABRO] for breach of contract fails as a matter of law as well."[10]

To the extent that Zorin alternatively claims an open-ended agreement in addition to an alleged agreement through October 2017, these same principals would apply. Zorin's testimony about his alleged agreement is unclear as to the term. On the one hand, he testified he understood the relationship would last as long as he wanted it to last, regardless of ABRO's willingness to continue in that relationship. [App. 5, Zorin Dep. at 104.] Alternatively, he testified either party could leave for "very serious reasons" or "a very good reason." [App. 5, Zorin Dep. at 104, 106.] Most importantly, Zorin admits the length of the term was not

---

[10]     *See also* Indiana Code section 26-1-2-309(b)("Where the contract provides for successive performances but is indefinite in duration, it is valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party.")

discussed.  [App. 5, Zorin Dep. at 103.]  As such, any agreement between Zorin and ABRO was terminable at will, and discontinuing that relationship is not a breach of the agreement.[11]

Because neither Zorin nor Babenchik has established a valid contract requiring ABRO to ship products to them or to continue to work with them on a commission basis indefinitely, both of their breach of contract claims must be dismissed.

III.   **Counts III and IV should be dismissed because the 1 New Trade parties cannot show that ABRO acted illegally and without justification in seeking to protect their intellectual property and goodwill in the Russian market.**

A.   **Indiana law requires proving that the interference was unjustified and achieved by illegal means to establish a claim for tortious interference with a business relationship.**

The elements of tortious interference with a business relationship are:  (1) the existence of a valid relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from defendant's wrongful interference with the relationship."  *Miller v. Central Indiana Community Foundation, Inc.*, 11 N.E.3d 944, 961 (Ind. Ct. App. 2014). "Illegal conduct by the alleged wrongdoer is an essential element of tortious interference with a business relationship."  *Id.*; *see also Melton v. Ousley*, 925 N.E.2d 430, 436 (Ind. Ct. App. 2010)("The Indiana Supreme Court has held that tortious interference with a business relationship requires the additional showing that a defendant acted illegally in achieving his end."); *Hoffman v. Roberto*, 578 N.E.2d 701, 710 (Ind. Ct. App. 1991)("[O]ne who alleges tortious interference with

---

[11]    Even if "serious" or "good" reason for termination were required, ABRO had ample grounds to terminate the relationship with Zorin.  Zorin admitted to getting into a drunken argument at ABRO's October 2012 sales meeting and failing to cooperate with ABRO's sales manager for the Russian territory, Molnar. [App. 5, Zorin Dep. at 193-96, 266-69, 272, 279; App. 10, Deposition Ex. 22.] Zorin's account with ABRO for product shipped to his companies was delinquent.  And, ABRO discovered that Zorin was working with an affiliate to ABRO's supplier (Quest) to set up a competing business using products intentionally designed to replicate ABRO's products.  [App. 4, Baranay Dep. at 69-70; App. 2, Molnar Dep. at 65.]

16

a contractual or business relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another.").

"The existence of a legitimate reason for the defendant's actions provides the necessary justification to avoid liability." *Bilimoria Computer Systems, LLC v. American Online, Inc.*, 829 N.E.2d 150 (Ind. Ct. App. 2005), citing *Morgan Asset Holding Corp. v. CoBank*, *ACB*, 736 N.E.2d 1268, 1272 (Ind. Ct. App. 2000). A party is justified in interfering with a third party's contract if it "asserts in good faith a legally protected interest of [its] own . . . if the actor believes that [its] interest may otherwise be impaired or destroyed by the performance of the contract or transaction." *Morgan Asset Holding*, 736 N.E.2d at 1273 n.3, quoting Restatement (Second) of Torts § 773 (1979). The required element of lack of justification requires a showing that the alleged interferer acted intentionally, without a legitimate business purpose, and that the alleged breach is malicious and exclusively directed to the injury and damage of another. *Bilimoria*, 829 N.E.2d at 156. The existence of a legitimate reason for the defendant's actions provides the necessary justification to avoid liability. *Id.* The Indiana Court of Appeals has recognized that "[o]ne's privilege to engage in business and to compete with others implies a privilege to induce third persons to do their business with him rather than with his competitors. In order not to hamper competition unduly, the rule stated in this Section entitles one not only to seek to divert business from his competitors generally but also from a particular competitor." *Harvest Life Ins. Co. v. Getche*, 701 N.E.2d 871, 877 (Ind. Ct. App. 1998), quoting Restatement (Second) of Torts § 768 cmt. e (1977).

Justification acts not as an affirmative defense which the defendant must prove but as an element of the plaintiff's prima facie case on its tortious interference claim. *Bradley v. Hall*, 720

N.E.2d 747, 751 n.4 (1999).  "[T]o properly state a cause of action for intentional interference with contractual rights, a plaintiff must state more than a mere assertion that the defendant's conduct was unjustified"; rather "plaintiff must set forth factual allegations from which it can reasonably be inferred that the defendant's conduct was unjustified."  *HPI Health Care Services, Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 545 N.E.2d 627, 677, 137 Ill. Dec. 19 (Ill. 1989). In assessing justification, courts consider:   (a) the nature of the defendant's conduct; (b) defendant's motive; (c) interests of the plaintiff with which the defendant's conduct interferes; (d) interests sought to be advanced by the defendant; (e) social interests in protecting the freedom of action of the defendant and the contractual interests of the plaintiff; (f) proximity or remoteness of the defendant's conduct to the interference; and (b) the relations between the parties. *See Winkler v. V.G. Reed & Sons*, 638 N.E.2d 1228, 1235 (Ind. 1994).

**B.**     **Zorin and Babenchik have not established any prospective business relationship or ABRO's knowledge of same.**

Zorin's and Babenchik's attempt to state individual claims for tortious interference with business relationship is merely a continuation of their confusion of the entity with the individuals demonstrated throughout this case.  The pleadings establish that the only prospective business relationships alleged are potential supplier relationships between 1 New Trade, on the one hand, and Quest and China-based suppliers of products from whom 1 New Trade sought to obtain to compete with ABRO.  Their own pleadings contend that those were potential relationships to supply product to 1 New Trade, their newly formed company, rather than with them individually. [Doc. 23, at ¶¶ 64, 65.]

1 New Trade is a Maryland corporation Zorin and Babenchik formed in or around September 2013 for purposes of competing with ABRO.  [App. 5, Zorin Dep. at 242-43.  This separate legal entity did attempt to establish a business relationship with Quest for a supply of

products directly competitive to ABRO.  Babenchik has also formed a company in St. Petersburg called 1 New, Ltd., while Zorin at one point owned a company called Novokhim, Ltd. in Moscow; both were listed as "Representative[s]" where buyers could obtain 1 New Trade's products on the 1 New Trade website. [App. 5, Zorin Dep. at 243-45; App. 13, Deposition Ex. 18.]  It is possible that one or more of these legal entities was engaged in efforts to establish a supplier relationship, but there is no evidence that Zorin or Babenchik were engaged in such efforts in their individual capacities.  Nor is there any evidence that ABRO had any knowledge of such relationship, as required to establish a claim.

Lack of knowledge of any relationship between either Zorin or Babenchik and any supplier is fatal to their individual claims.  Moreover, as shown below, ABRO's actions were justified and not illegal.  Thus, all defendants' tortious interference claims fail as a matter of law.

**C.**      **ABRO's actions to protect its intellectual property and goodwill in the Russian market were justified.**

As a leading distributor of top quality automotive, industrial, and consumer products to customers in countries across the globe, ABRO has expended substantial effort and resources to build a valuable reputation and substantial good will in its brands.  [App. 3, Baranay Decl. at ¶ 2.]  ABRO's success is built on its strong network of distributors and the quality and goodwill associated with ABRO's intellectual property. ABRO owns an extensive portfolio of intellectual property rights in more than 165 countries. Because of the value of ABRO's intellectual property, ABRO takes enforcement very seriously. ABRO has an extensive anti-counterfeiting program throughout the world. The program has resulted in countless raids, product seizures, arrests and jail terms for counterfeiters.  [App. 3, Baranay Decl. at ¶ 3.]  Zorin recognized the importance ABRO placed on preventing counterfeit goods in the Russian marketplace and

testified that at least beginning in January 2008, he understood that fighting counterfeit products was part of ABRO's strategy for growing the Russian market.  [App. 5, Zorin Dep. at 161.]

While still doing business with ABRO, Zorin developed a strategy to launch a competing business replicating ABRO's business in Russia.  In the fall 2013, Zorin met with representatives from Quest Specialty Coatings to discuss replacing products he was then acquiring from ABRO with competing products.  [App. 14, Quest 30(b)(6) Dep. at 16.]  He provided Quest with ███████ ████████████  [App. 14, Quest 30(b)(6) Dep. at 16; ABRO Deposition Ex. 227.]  Zorin admits that, at this time, he was continuing his work as an ABRO distributor and was concealing his interactions with Quest from ABRO.  [App. 5, Zorin Dep. at 221-22.]  While he intended to cease his relationship with ABRO at some point, Zorin did not want to end that relationship before he had replacement product.  [App. 5, Zorin Dep. at 222.]

Quest was concerned about the effect doing business with Zorin in competition with ABRO would have on its relationship with ABRO.  For example, "Quest did not want to provide the same products to Mr. Zorin as they were already providing to ABRO . . . . [b]ecause they did not want to sour the relationship with ABRO."  [App. 14, Quest 30(b)(6) Dep. at 17.]  In fact, the representatives of Quest Automotive Products ("QAP") division turned down Zorin's overtures because of concerns about the existing relationship with Quest.  [App. 14, Quest 30(b)(6) Dep. at 34.]  However, Steve Hughes, at Quest's Industrial Products ("QIP") division was interested in helping Zorin compete with ABRO at a significant level as he wrote: ████████████ ████████████████████████████████████████████ ████████████████████████████████████████  [App. 15, Deposition Ex. 227.]  Quest representatives began ████████████████ ████████████████████████████████████████

████████, as "[b]asic competitive intelligence." [App. 14, Quest 30(b)(6) deposition at 27; App. 15, Deposition Ex. 227.] Quest was interested in "target[ing] the business ABRO was currently doing in Russia" "[v]ia Mr. Zorin." [App. 14, Quest 30(b)(6) deposition at 27.]

As an ABRO supplier since 1994, Zorin understood that ABRO's Carb & Choke cleaner was the single best selling ABRO product in Russia. Thus, it was not coincidental that Zorin targeted the Carb & Choke cleaner for his first product to purchase from Quest. [App. 21, Deposition Ex. 229.] But, it was not enough to just introduce a competing Carb & Choke cleaner, 1 New Trade introduced a virtually identical looking Carb & Choke cleaner into the Russian market with Quest's help. Below is a side-by-side comparison of ABRO's top seller, with which Zorin was well familiar, and 1 New Trade's competing Carb & Choke cleaner:

 

There is evidence in the record that the resemblance[12] was not accidental, as Zorin instructed Quest's representative Dana Jeske that the product ████████████████████████ ████████████████████████[App. 24, Deposition Ex. 233.]

---

[12]     This resemblance was pointed out by photographer Scott Bourdon when counsel for 1 New Trade asked him to compare the ABRO and 1 New Trade Carb & Choke products. [App. 23, Bourdon Dep. at 45 (describing the look of the two products as "very similar".]

18929440.3

While ABRO's Carb & Choke cleaner was its highest volume product in Russia, spray paint was its best-selling line of products.  [App. 4, Baranay Dep. at 65.]  Knowing this from his years as an ABRO distributor, Zorin reached out to ABRO's Chinese-based spray paint supplier Shenzhen Rainbow Fine Chemical Industry Company to obtain competing products.  [App. 4, Baranay Dep. at 65.]  1 New Trade also contacted another Chinese company, Join Leader, the manufacturer of ABRO's private label gasket maker, a company Zorin had been introduced to through his relationship with ABRO.  [App. 4, Baranay Dep. at 56.]  Again, Zorin's efforts were not just to create a competing product but to create what ABRO determined to be a product, infringing on ABRO's trade dress in violation of Chinese law. [App. 4, Baranay Dep. at 57-58.]

1 New Trade, Zorin and Babenchik claim ABRO tortiously interfered with these prospective supplier relationships.  In the instance of the Quest relationship, 1 New Trade contends ABRO interfered by filing this lawsuit.  In the instance of the China-based suppliers Join Leader and Rainbow, 1 New Trade contends ABRO's interference took the form of threatened "economic sanctions" and litigation.

It is undisputed ABRO filed this lawsuit against Quest alleging copyright infringement. [Doc. 23.]  However, the 1 New Trade Defendants cannot show ABRO acted illegally and without justification in filing this lawsuit. In fact, the litigation privilege that attaches to ABRO's filing of this litigation.  "Indiana law affords absolute privilege to statements made in the course of a judicial proceeding." *Van Eaton v. Fink*, 697 N.E.2d 490, 494 (Ind. Ct. App. 1998). *See also Rain v.Rolls-Royce Corp.*, 626 F.3d 372, 376 (7th Cir. 2010) ("Indiana law has long recognized an absolute privilege that protects all relevant statements made in the course of a judicial proceeding, regardless of the truth or motive behind the statements.") (quoting *Hartman v. Keri*,883 N.E.2d 774, 777 (Ind. 2008)).

18929440.3

In *Estate of Mayer v. Lax, Inc.*, 998 N.E.2d 238 (Ind. Ct. App. 2013), a party brought claims for defamation, negligent supervision and retention, tortious interference with a business relationship, and tortious interference with a contract against its opponent in a prior action, on the grounds that the opponent had brought counterclaims in that action accusing it of conspiracy, bribery, racketeering, and other species of chicanery. 998 N.E.2d at 243–244, 249. Rejecting the argument that the absolute litigation privilege would bar all of the derivative claims, the court nevertheless agreed that the privilege could extend beyond the narrow bounds of defamation: "Other torts related to defamation, or relying upon defamatory statements as proof of wrongdoing," the court concluded, "may also be barred by the litigation privilege." *Id.* at 249 (emphasis added). Thus, the court applied the privilege to an action for tortious interference, reasoning analogizing the statement upon which the claim was based to defamation. In *Watson Rural Water Co. v. Ind. Cities Water Corp.*, 540 N.E.2d 139 (Ind. Ct. App. 1989), the court held a party's public statement of its contested litigation position was an improper predicate act for tortious interference liability and shielded by the litigation privilege. 540 N.E.2d at 149.

> Watson essentially contends that Indiana Cities' public representations, that it, rather than Watson, had the right to provide water utility service to the hospital and other disputed areas, constituted interference with Watson's business relationships. Such representations made in good faith, simply do not constitute illegal acts sufficient to support a claim of tortious interference with a business relationship. Furthermore, insofar as Indiana Cities representations were made within the context of litigation, such representations are privileged and will not serve as a basis for liability.

*Id.* (citing *Briggs v. Clinton Cnty. Bank & Trust Co.*, 452 N.E.2d 989, 997 (Ind. Ct. App. 1983))(emphasis added).

Even where litigation is not filed, such as in the case of the China-based suppliers, a qualified litigation privilege attaches where a communication is "fairly made by a person in the discharge of some public or private duty, legal or moral, or in the conduct of his [or her] own

affairs, in a matter where his [or her] interest is concerned. *Front, Inc. v. Khalil*, 24 N.E.3d 713, 719, 28 N.E.3d 15; 4 N.Y.S.3d 581 (2015), quoting *Rosenberg v. Metlife, Inc.*, 8 N.Y.3d 359, 365, 855 N.E.2d 439, 834 N.Y.2d 494 (2007). The rationale supporting the application of privileged status to communication made by attorneys during the course of litigation is also relevant to pre-litigation communication. When litigation is anticipated, attorneys and parties should be free to communicate in order to reduce or avoid the need to actually commence litigation." *Front, Inc.*, 24 N.E.3d at 719. ABRO is alleged to have done nothing more than pursue its rights and seek to avoid further legal proceedings in China over intellectual property rights. It acted in protecting its legal rights and valuable good will, as it has done many times in the past as part of its business.

With respect to the China-based distributors, the purported "economic sanctions" amount to nothing more than ABRO telling its existing suppliers it will discontinue doing business with them if they continue to produce virtually identical products for the competing enterprise at 1 New Trade. [App. 4, Baranay Dep. Ex. 4.] With respect to Join Leader, ABRO perceived the gasket maker product that Join Leader had produced for 1 New Trade to infringe on its intellectual property. [App. 4, Baranay Dep. at 56-59.] This is a product for which ABRO had been battling counterfeiting in China for many years and had, therefore, registered the "ABRO trademark and trade dress in multiple forms, fashions, and formulas to give [ABRO] the broadest possible protection." [App 4, Baranay Dep. at 58-59 (noting that those registrations specifically included filings and registrations in China).] ABRO told Join Leader's owner that ABRO and its China-based attorneys viewed the gasket maker as a violation of its intellectual property rights and that if Join Leader continued to manufacture it for 1 New Trade, it would be at Join Leader's own legal peril. [App. 4, Baranay Dep. 64-65.]

24

As the above facts demonstrate, ABRO, a business vigilant in the protection of its intellectual property rights and goodwill, was faced with the most perilous of competition.  Its long-time distributor and its own suppliers were teaming up to introduce competing products into the Russian marketplace.  Together, 1 New Trade and these suppliers were familiar with ABRO's pricing, its purchase costs, its product mix in terms of sales, its distribution network and essentially all aspects of ABRO's business.  ABRO was justified in being concerned that 1 New Trade and these suppliers would attempt to "emulate" ABRO's Russian business to the detriment of ABRO.  ABRO was justified in acting to protect this interest.

There is no evidence that ABRO acted illegally in protecting this interest, as is required to maintain a tortious interference with business relationships claim under Indiana law.  At a minimum, the 1 New Trade parties must allege an illegal act by ABRO to sustain their claims.  Instead they have alleged nothing more than the filing of a lawsuit for which a privilege provides immunity, and ABRO's assertion of its right not to continue to do business with companies it believes to be causing it harm.  ABRO's business justification and the litigation privilege are fatal to the claims for tortious interference, and summary judgment should be granted on those claims.

## CONCLUSION

For all the reasons shown above the Counterclaims fail as a matter of law.  Summary judgment should be granted in ABRO's favor and the counterclaims dismissed with prejudice.

18929440.3

Respectfully submitted,


 */s/ Anne L. Cowgur*
Jonathan G. Polak
Anne L. Cowgur
Taft Stettinius & Hollister LLP
One Indiana Square, Suite 3500
Indianapolis, Indiana 46204
Email: acowgur@taftlaw.com
Tel: 317.713.3500
Fax: 317.713.3699
*Attorneys for ABRO Industries, Inc. and
Peter Baranay*


## CERTIFICATE OF SERVICE

I hereby certify that on April 19, 2017, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to all attorneys of record by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

 */s/ Anne L. Cowgur*

26

18929440.3