# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| ABRO INDUSTRIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 3:14-CV-1984-TLS |
| | ) | |
| 1 NEW TRADE, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

These matters come before the Court on Plaintiff ABRO Industries' ("ABRO") Motion for Summary Judgment [ECF No. 166], filed on April 19, 2017; Defendants 1NEW Trade, Igor Zorin, Vadim Fishkin, and Boris Babenchik's (collectively "the Defendants") Motion for Summary Judgment [ECF No. 175], filed on May 1, 2017; and Third Party Defendant Peter Baranay's Motion for Summary Judgment [ECF No. 168] filed on April 19, 2017. The Defendants have also filed a Motion to Strike ABRO Industries' Copyright Office Registration Certificates [ECF No. 204] and a Motion to Strike ABRO Industries' Expert Report on Damages [ECF No. 205]. ABRO filed a Motion to Strike Portions of the Joint Declaration Submitted by Defendants [ECF No. 195] and a Motion for Leave to File a Motion to Strike Declarations Filed by the 1NEW Defendants [ECF No. 212]. These matters are fully briefed and ripe for review.

## PROCEDURAL HISTORY

On November 4, 2014, ABRO filed its Amended Complaint [ECF No.7], claiming that the Defendants and Quest Specialty Coatings, LLC ("Quest") infringed on ABRO's copyrights relating to carburetor and choke cleaner packaging. On December 31, 2014, the Defendants filed

their Answer to ABRO's Amended Complaint [ECF No. 23], asserting a series of counterclaims against ABRO, including breach of fiduciary duty, breach of contract, and tortious interference with prospective and/or existing business relationships, requesting both monetary and injunctive relief. Also on December 31, 2014, Zorin and Babenchik filed a Third Party Complaint [ECF No. 24] against Peter Baranay, president of ABRO, asserting tortious interference with business relationships. On February 21, 2017, ABRO filed a Consent Motion to Dismiss all claims as to Quest [ECF No. 27], which the Court granted on March 1, 2017 [ECF No. 159].

## FACTUAL BACKGROUND

ABRO manufactures automotive parts and supplies and consumer hardware goods for sale internationally, including a carburetor and choke cleaner product called "Carb & Choke Cleaner." At all relevant times, Peter Baranay has been the president of ABRO. As president, Baranay has ultimate authority over all aspects of the business, including forming and terminating business relationships, growing sales, and developing strategies for the management of distribution channels. Michael Molnar is ABRO's purchasing and sales manager for Western Europe, Eastern Europe, and Eurasia.

ABRO and Igor Zorin began their business relationship in 1994, which started out as a buyer-seller relationship: Zorin pre-paid for ABRO goods, and ABRO shipped the goods to Zorin or his companies. Neither party disputes that, at this time, there was no sharing of profits.

In October 1995, ABRO and Zorin entered into various agreements to promote the sale of ABRO products in Russia. To this end, and with Baranay's approval, Zorin created a company called ABRO Rus, specifically for the sale of ABRO products. The parties dispute the compensation arrangement, with ABRO arguing that it did not share in ABRO Rus's profits and

Zorin arguing that ABRO was the revenue collecting and profit distributing partner and, thus, the only one in a position to account for and distribute profits. There is no written record of these agreements.

Boris Babenchik's relationship with ABRO began in 1996 when Babenchik began to sell and distribute ABRO goods. Babenchik's primary responsibility in that relationship was to locate distributors, for which he was to be compensated based on the purchases of those distributors. ABRO argues that this was a commission arrangement, pointing to Babenchik's deposition testimony that referred to it as such. However, other pieces of Babenchik's testimony from this deposition call ABRO's conclusion into doubt. For example, Babenchik testified that he was unsure of the meaning of commission, as he was testifying through a translator and could understand only about a tenth of what was being said in English, and he was unsure that "commission" was an accurate characterization of the arrangement.

In 1996, the parties collectively set various sales goals. Baranay was responsible for developing new products; Zorin and Babenchik were responsible for developing new products, advertising, and seeking new distributors in Russia. ABRO never added any new distributors to its network in Russia without Zorin's approval. Babenchik was also to help distributors develop and advertise in their respective territories. Although Babenchik's company, Krepost, could sell ABRO products throughout Russia, it was not permitted to sell ABRO products in the cities in which these distributors were located. Zorin and Babenchik agreed to act as guarantors of payments for the distributors each recruited. None of these distributors ever defaulted, and, therefore, neither Zorin nor Babenchik were ever called upon to satisfy that guarantee.

The parties disagree as to the compensation terms of this arrangement. ABRO characterizes the arrangement as commission-based, wherein Zorin would receive a commission

on sales generally, and Babenchik would receive a commission on the sales of distributors he brought to ABRO. The Defendants argue that ABRO's established practice was to refer to profit-sharing as "commissions" and that there were regular payments, offsets, and credits, which were all part of a profit sharing relationship.

Compensation based on sales by one of these distributors—Orient Invest—were paid into a Krepost account, instead of directly to Babenchik. According to Babenchik, ABRO directed the funds to the Krepost account at Babenchik's instruction. As the owner of Krepost, Babenchik testified that he never saw any difference between Krepost and himself individually, testifying that the agreement was between he—not Krepost—and ABRO. At one point during their business relationship, Babenchik suggested that ABRO forgo compensating him based on a Kazakhstan distributor's sales in order to develop the business.

The parties revised their Russian strategy in either 2007 or 2008 (the parties dispute at what point the strategy was proposed), which included a "percentage system" for Russian distributors, which Zorin characterizes as a system to stop price wars between Russian distributors and incentivize focus on growing business instead of poaching customers. The parties also divided responsibility concerning policing counterfeit products and product promotion. Zorin and Babenchik were responsible for the development of advertising campaigns for their respective companies, including participation in trade shows, although the Defendants argue that ABRO was also involved in these campaigns.

In October 2007, Zorin informed ABRO of his intent to retire in 2017. Zorin claims that at this time, the parties agreed that, until Zorin's retirement, ABRO would pay him 3% of the profits on Russian sales when the sales exceeded $25 million dollars so long as ABRO continued to do business with the distributors that Zorin recruited. If the goods were manufactured outside

of the United States, Zorin would receive 1.5% of the profits instead of 3%. The amount of money that resulted from the 40% profit Zorin earned based on his distribution efforts exceeded the percentage he was to receive out of the profits under this arrangement.

In 2012, tension developed between Zorin and Molnar. Zorin believed that Molnar's involvement with arranging new products with distributors and creating product design without Zorin's knowledge violated Zorin's agreement with ABRO and placed ABRO and the ABRO-Zorin relationship at risk. Zorin would not provide to Molnar all of the information Molnar requested, but Zorin disputes Molnar's authority to request such information. This tension culminated in an altercation between Zorin and Baranay during a 2012 meeting in Frankfort, for which Zorin later apologized to ABRO. Zorin now argues that the apology was insincere and that he was forced to lie in order to avoid losing ABRO's business.

In February 2013, ABRO ceased the direct shipment of goods, other than spray paint, to both Zorin and Babenchik. Zorin's relationship with ABRO was officially terminated in December 2013. In 2014, Babenchik decided to transfer his ownership in Krepost in order to discontinue his relationship with ABRO, but he retained ownership until the divestiture was completed. After ABRO's formal termination in 2017 of the ABRO-Krepost sales agreement, Babenchik rescinded that decision and returned to an active role in the company.

The Defendants allege that the reason for the termination of their relationships with ABRO was due to their refusal to participate in a criminal, tax-evasion enterprise. Specifically, ABRO kept two sets of transportation documents and invoices with altered prices, shippers, sellers, and buyers. The Defendants allege that this was a regular practice and that this practice was expressly sanctioned and directed by Baranay. ABRO does not deny the existence of altered

documents, but rather argues that such documents were produced only at customer request and that ABRO never knew—and never asked—about the purpose for which they were requested.

In December 2012, the Defendants allege that ABRO decided that Zorin and Babenchik must participate in its scheme so that the declared pricing on imported ABRO goods would be consistent to avoid unwelcome attention from customs officials. The Defendants state that they asked ABRO to begin shipping goods directly to them so they did not have to participate in this "grey scheme." However, ABRO refused to ship any product directly to the Defendants except for spray paint—the only product, so the Defendants allege, for which there were no price discrepancies. When Zorin refused to participate in ABRO's activities, Zorin alleges that ABRO terminated his relationship without notice and without explanation.

In October 2013, Zorin and Babenchik incorporated 1NEW Trade, Inc., to import and sell products in Russia. ABRO characterizes the creation of this company as a direct attempt to compete with ABRO and argues that Zorin falsely apologized for his quarrel with Baranay to buy himself time to set up this competing company. Zorin and Babenchik dispute this characterization and state that the initial purpose of the company was to import and sell wallpaper and glues and adhesives for hardwood floors—products ABRO did not sell. They claim that they decided to use 1NEW Trade to compete with ABRO only after ABRO breached their agreements.

Also in the fall of 2013, Zorin met with Steve Hughes of Quest Specialty Coatings to discuss replacing products currently supplied by ABRO with competing products supplied by Quest. Quest was an affiliate of one of ABRO's suppliers. At this time, Zorin was still selling ABRO's products. Quest did not want to sell to Zorin the same products it sold to ABRO because Quest did not want to sour its relationship with ABRO. However, Quest was interested

in targeting ABRO's Russian business through Zorin and began researching ABRO's top products.

One of the Defendants' competing products was a "Carb & Choke Cleaner." ABRO argues that, with Quest's aid, 1NEW Trade intentionally released a product that looked nearly identical to ABRO's product. 1NEW Trade additionally reached out to ABRO's spray paint supplier in China, Shenzhen Rainbow Fine Chemical Industry Company ("Shenzhen Rainbow"), and ABRO's gasket maker in China, Join Leader Adhesives Co. ("Join Leader"). ABRO admitted that none of the 1NEW Trade products manufactured in China looked anything like any of ABRO's products. Nevertheless, ABRO asked both suppliers to refrain from doing any business with 1NEW Trade at the risk of ABRO's complete withdrawal of its own business. Neither Quest, Shenzhen Rainbow, nor Join Leader currently do business with 1NEW Trade.

## STANDARD OF REVIEW

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is the moment in litigation in which the nonmoving party is required to marshal and present the court with evidence on which a reasonable jury could rely to find in that party's favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court should deny a motion for summary judgment only when the nonmoving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (first citing *United States v. 5443 Suffield Terrace*, 607 F.3d 504, 510 (7th Cir. 2010); then citing *Swearnigen-El v. Cook Cty. Sheriff's Dep't*, 602 F.3d 852, 859 (7th Cir. 2010)). A court's role in deciding a motion for summary judgment "is not to sift

through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heocht Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Material facts are those that are outcome determinative under the applicable law. *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Although a bare contention that an issue of material fact exists is insufficient to create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *see Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

## DISCUSSION

ABRO asserts copyright infringement against all Defendants. ABRO also asserts personal liability and/or vicarious liability for copyright infringement against Defendants Zorin, Babenchik, and Fishkin. Defendants Zorin and Babenchik each counterclaim against ABRO for breach of fiduciary duty and breach of contract. Collectively, the Defendants counterclaim for tortious interference with prospective and/or existing business relationships with third parties, seeking both monetary damages and injunctive relief. Defendants Zorin and Babenchik further assert a third-party claim against Baranay for tortious interference with existing business relationships.

**A.      ABRO's Claim for Copyright Infringement**

The Defendants have moved for summary judgment as to ABRO's copyright infringement claims. A plaintiff claiming copyright infringement must show both "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *Wildlife Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 507 (7th Cir. 1994). "A certificate of registration from the U.S. Register of Copyrights constitutes *prima facie* evidence of the validity of a copyright," entitling the registrant to a rebuttable presumption of validity. *Wildlife Express Corp.*, 18 F.3d at 507.

*1.      Presumption of Validity*

The Defendants argue that ABRO has no admissible evidence of certificates of registration because ABRO did not produce the certificates on which it now relies until it filed its Response to the Defendants' Motion for Summary Judgment. The Defendants argue that the Court should strike the certificates from the record for ABRO's failure to disclose them during discovery. ABRO argues that the failure to produce the registrations was an excusable oversight. Further, ABRO argues that evidence of the copyright registration was publically available and within the Defendants' possession. In short, ABRO seems to argue that it was the Defendants' obligation to secure the certificates from the Copyright Office or compel ABRO to produce them because the Defendants were on notice that such certificates existed based on other discovery. However, under the Federal Rules, it was ABRO's affirmative obligation "to produce, without being asked" copies of all documents that it "*may use to support its claims or defenses*." *Pruet v. Fayette Reg'l Health Sys.*, No. 1:12-CV-635, 2013 WL 5236609, at *2 (S.D. Ind. Sept. 17, 2013) (emphasis in original) (finding that where a party "submits as evidence in support of its motion

for summary judgment [documents] that [it] did not produce during discovery," the court will not consider those documents).

ABRO argues that failure to produce documents is excusable where the "the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Factors for the Court to evaluate when considering whether a failure to disclose was substantially justified or harmless include: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Tribble v. Evangelides*, 670 F.3d 753, 760 (7th Cir. 2012). ABRO argues there was no prejudice or surprise because the Defendants were aware that such certificates existed and knew the scope of protection afforded to the subject material. The Court disagrees. The failure to produce these certificates directly affected the Defendants' arguments in their summary judgment motion. The Defendants argued that there was no presumption of validity because they concluded that, because ABRO had not produced these fundamental documents, the certificates did not exist. Without the certificates in hand, the Defendants were unable to evaluate them and argue about their relevance and weight in their opening brief. Instead, the Defendants were forced to make such arguments in their reply brief. It is disingenuous for ABRO to argue that its failure to produce these certificates was not prejudicial when it now argues that the Defendants have waived any argument attacking the substance or usefulness of the certificates by not making said argument *prior to receiving the certificates*. (*See* ABRO Mot. for Leave to file Mot. to Strike at 2 n.1, ECF No. 212.)

The Court need not determine whether to strike the certificates from the record because, even if admissible, the certificates do not establish what subject matter is actually registered.[1]

---

[1] The Court does not agree with ABRO that the Defendants' argument that the certificates do not establish a presumption of validity for failure to demonstrate the subject matter to which they apply is waived. The

Nowhere in the record does the Court find a depiction of what ABRO submitted to the Copyright Office or for what subject matter the Copyright Office issued certificates. The Court notes that copies of the deposit materials are not per se required to prove validity. *See, e.g.*, *Thomas v. Artino*, 723 F. Supp. 2d 822, 830 (D. Md. 2010) ("Defendant has not cited any cases that state that Plaintiff must provide the application, file, deposit, or a 'certified copy' of the registered work to prove that he holds the copyright."); *but see Alaska Stock, LLC v. Pearson Educ., Inc.*, 975 F. Supp. 2d 1027, 1040 (D. Alaska 2013) ("[T]he certificates of registration in this case do not provide the details necessary to confirm that the image or images relating to Alaska Stock's claims are the same images underlying the certificates of registration" and are therefore "not covered by the presumption of validity.").

A party is entitled to a presumption of validity only if the copyright is registered "before or within five years after first publication of the work." 17 U.S.C. § 410(c). There is no dispute that ABRO did not register its works with the United States Copyright Office before or within five years after first publication of the work. ABRO, however, points out that when a work is registered beyond the allotted five years, there is no per se bar to the presumption of validity. Rather, "[t]he evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court." 17 U.S.C. § 410(c). "Most courts conclude that untimely certificates constitute prima facie evidence of validity of copyrights." *Brighton Collectibles, Inc. v. RK Tex. Leather Mfg.*, No. 10-CV-419, 2012 WL 6553403, at *2 (S.D. Cal. Dec. 13, 2013). Thus, ABRO argues, the Court should grant a presumption of validity to its

---

Defendants argued that ABRO had no presumption of validity because "ABRO ha[d] never produced any certificates of copyright registration from the Copyright Office for any of the elements of the packaging . . . ." (Def. Br. at 3–4, ECF No. 176.) ABRO responded by producing certificates to rebut that argument. The Defendants were well within their rights to respond to that production by attacking the documents' evidentiary value.

registered copyrights. The Defendants disagree and argue that "ABRO fails to even explain why and on what basis this Court should exercise such discretion." (Def. Reply Br. 6, ECF No. 202.)

Because the copyrights were registered more than five years after the first publication of the works, ABRO is not entitled to a presumption of validity. The Court is not inclined to exercise its discretion to grant such a presumption in light of ABRO's failure to produce any deposit materials that would aid the Court in confirming the scope of the registrations. *See Lanard Toys Ltd. v. Novelty, Inc.*, No. CV 05-8406, 2007 WL 2439505, at *6–7 (C.D. Cal. Mar. 17, 2006) (refusing to grant presumption where deposit materials were not produced). Because the Court declines to grant ABRO a presumption of validity as to any of its claimed copyrights, the Defendants' motion to strike ABRO's registration certificates is moot.

### 2.      *Existence of Copyrightable Material*

Even if ABRO was entitled to a presumption of validity, it is a presumption, not a guarantee, and the Court must still address the copyrightability of the claimed material. "The *sine qua non* of copyright is originality." *Feist*, 499 U.S. at 345. The Copyright Act protects "original works of authorship fixed in any tangible medium of expression . . . from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." *Schrock v. Learning Curve Int'l, Inc.*, 586 F.3d 513, 517 (7th Cir. 2009) (quoting 17 U.S.C. § 102(a)). Originality means that "the work was independently created by the author . . . and that it possesses at least some minimal degree of creativity . . . . [T]he requisite level of creativity is extremely low; even a slight amount will suffice." *Id.* (quoting *Feist*, 499 U.S. at 345). A fundamental principle of copyright law is that the expression of an idea, process, or concept can be copyrighted, but not the idea, process, or concept itself. 17 U.S.C. § 102(b); *see*

*also Feist*, 499 U.S. at 349–50; *Bucklew v. Hawkins, Ash, Baptie & Co.*, 329 F.3d 923, 933 (7th Cir. 2003); *Publ'ns Int'l, Ltd. v. Meredith Corp.*, 88 F.3d 473, 481 (7th Cir. 1996).

a.      *The Carb & Choke Label*

"[L]abels are subject to copyright protection if the label manifests the necessary modicum of creativity." *Sebastian Int'l, Inc. v. Consumer Contract (PTY) Ltd.*, 664 F. Supp. 909, 913 (D.N.J. 1987) (vacated on other grounds, 847 F.2d 1093 (3d Cir. 1988)) (citations omitted). The Copyright Office refused to issue a registration for ABRO's label, stating that ABRO's claim "appear[ed] to amount to a claim in layout or format," which "[t]he Copyright Office regards . . . as ideas or concepts, which cannot be protected by copyright. (Def. Br. Exh. 12b 4–5, ECF No. 177-15.) ABRO objected to the Copyright Office's characterization of its submission and argued that the label was a protectable compilation, the selection and arrangement of which exhibited the requisite minimal degree of creativity. The Copyright Office affirmed its refusal, maintaining that that ABRO's "selection and arrangement consist[ed] of putting a photograph next to text on a page which amounts to layout which copyright does not protect." (*Id.* at 1.) As such, the Copyright Office could register the "text" and the "photos," but required ABRO to remove from its application "the references to 2-D artwork . . . and arrangement of text and images." (*Id.*) ABRO consented to the removal of the objectionable language, choosing to move forward with registration only of the "text" and "photo." (Def. Br. Exh. 12d 1, ECF No. 177-17.)

The Court agrees with the Copyright Office. A layout may be copyrightable only if the "arrangement or layout [is] original and unique." ABRO's label as a whole, and regardless of its individual elements, simply does not meet this requirement. There is nothing unique about placing the name of the company and the name of a product at the top of a product's packaging

with a descriptive image below that text and with instructions and legally mandated warnings wrapped around the remainder of a product's packaging. In fact, as the parties' submissions show, this is a common layout. (*See* Def. Br. Exh. 17, 21–22, ECF Nos. 22, 26–27.) This is unsurprising as such layouts are a "natural result of [the] chosen subject matter." *Fooey Inc. v. Gap, Inc.*, No. 12 C 5713, 2013 WL 2237515, at *2 (N.D. Ill. May 17, 2013). "[W]here a particular expression is common to the treatment of a particular idea, process, or discovery, it is lacking in the originality that is the *sine qua non* for copyright protection." *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 838 (10th Cir. 1993) (citing *Feist*, 499 U.S. at 348). *Cf. Design Basics, LLC v. Lexington Homes, Inc.*, 858 F.3d 1093, 1103 (7th Cir. 2017) ("Lexington's accused plans resemble Design Basics' plans, but only because both sets resemble common home designs . . . . There are only so many ways to arrange a few bedrooms, a kitchen, some common areas, and an attached garage . . . ." (internal quotations omitted)). Thus, ABRO's label as a whole is not copyrightable.

b.    *Individual Elements of the Carb & Choke Label*

The Court must now consider whether any of the individual elements on ABRO's label are copyrightable. It appears that ABRO is claiming that the image of a carburetor, the name "Carb & Choke Cleaner," and the instructions and warnings are individually protected. The Court will consider each in turn.

i.    Carburetor Image

The Court finds that the image of a carburetor displayed on ABRO's label for Carb & Choke Cleaner is copyrightable. The Copyright Act extends copyright protection to pictorial and

graphic works. 17 U.S.C. § 102(a)(5). "Federal courts have historically applied a generous standard of originality in evaluating photographic works for copyright protection." *Schrock*, 586 F.3d at 519. "[I]n many cases, the photographer does not invent the scene or create the subject matter depicted in it." *Id.* Rather, "the original expression he contributes lies in the rendition of the subject matter—that is, the effect created by the combination of his choices of perspective, angle, lighting, shading, focus, lens, and so on." *Id.* ABRO did not create the subject matter of the photograph (the carburetor), but ABRO did choose other reflections of expression such as the perspective, angle, lighting, etc. Therefore, the image of the carburetor on ABRO's label satisfies the originality and creativity requirements for copyright protection.

ii.     "Carb & Choke Cleaner"

The Court finds that ABRO's product name "Carb & Choke Cleaner" is not copyrightable. The Copyright Act explicitly excludes short phrases. 17 U.S.C. § 102(b) ("Copyright does not protect . . . words and short phrases such as names, titles, and slogans . . . ."). Even so, ABRO argues that "Carb & Choke Cleaner" is copyrightable because the decision to use "carb" instead of "carburetor" is a design feature that exhibits originality and creativity. But, ABRO and the Defendants are not the only ones who abbreviate "carburetor" as "carb" to describe the function of the cleaner. In fact, this seems to be a common practice in the industry, as the manner in which a company can express that the function of its product is to clean carburetors and/or chokes is "sharply limited." *See Yankee Candle Co.*, *v. Bridgewater Candle Co.*, 259 F.3d 25, 36 n.6 (1st Cir. 2001).

iii.    Instructions and Warnings

The Court finds that the instructions and warnings placed on the back of ABRO's label are copyrightable. The Copyright Act protects "literary works" and "compilations." 17 U.S.C. §§ 102(a)(1), 103(a). "The necessary degree of 'originality' is low, and the work need not be aesthetically pleasing to be 'literary.'" *Am. Dental Ass'n v. Delta Dental Plans Ass'n*, 126 F.3d 977, 979 (7th Cir. 1997) (citing *Feist*, 499 U.S. at 345–46). Factual compilations are protected because "[t]he compilation author typically chooses which facts to include, in what order to place them, and how to arrange the collected data so that they may be used effectively by readers." *FMC Corp. v. Control Sol., Inc.*, 369 F. Supp. 2d 539, 562 (E.D. Pa. 2005). "These choices as to selection and arrangement, so long as they are made independently by the compiler and entail a minimal degree of creativity, are sufficiently original." *Id.* However, it is axiomatic that copyright law denies protection to "fragmentary words and phrases" and to "forms of expression dictated solely at functional considerations" on the grounds that these materials do not exhibit the minimal level of creativity necessary to warrant copyright protection. *Peters v. West*, 776 F. Supp. 2d 742, 750 (N.D. Ill. 2011).

User instructions are "description[s] of how to most effectively use [the product]" and "[are] the proper subject of a copyright." *Id.* at 561; *see also Am. Dental Ass'n*, 126 F.3d at 981 (instructions for filling out a non-copyrightable form still copyrightable). ABRO's instructions are arranged in a way that ABRO selected and have the minimal amount of originality and creativity to be eligible for copyright protection. However, such protection "may not necessarily be robust." *Id.* (citing *Feist*, 499 U.S. at 349). The same is true of the legally required warnings. ABRO's specific expressions and choices about how to communicate them to the consumer is entitled to copyright protection, but that protection may not be robust.

### 3.      *Substantial Similarity*

"Although summary judgment is disfavored on the substantial similarity issue in copyright cases, it is clearly appropriate . . . if, after viewing the evidence and drawing every inference in the light most favorable to the nonmoving party, the court concludes that no reasonable jury could find substantial similarity of both ideas and expression between the works at issue." *Worth v. Selchow & Righter Co.*, 827 F.2d 569, 571 (9th Cir. 1987) (internal citations and quotations omitted). "Judgment should be entered as a matter of law in copyright infringement cases when the only similarity concerns non-copyrightable elements or when no reasonable jury could find the [works] substantially similar." *S.C. Johnson & Son, Inc. v. Turtle Wax, Inc.*, No. 89 C 5792, 1989 WL 134802, at *1 (N.D. Ill. Oct. 17, 1989).

A plaintiff can demonstrate copying by showing that the infringer had access to the copyrighted work and that there is substantial similarity between the protected work and the infringing work. *Wildlife Express Corp.*, 18 F.3d at 508. The parties do not dispute that the Defendants had access to ABRO's works. Thus, ABRO must show that the components of the Defendants' label are substantially similar to the protectable portions of ABRO's label. In the Seventh Circuit, "[t]he test of substantial similarity is whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectable expression by taking material of substance and value." *Schiller and Schmidt, Inc. v. Wallace Computer Servs. Inc.*, No. 85 C 4415, 1989 WL 152860, at *3 (citing *Atari, Inc. v. N.A. Philips Consumer Elec. Corp.*, 672 F.2d 607, 614 (7th Cir. 1982) (vacated on other grounds)). "[W]hile dissection is generally disfavored, the substantial similarity test must take into account that the copyright laws only preclude

appropriation of the particular expression of an idea and never the idea itself." *Schiller*, 1989 WL 152860, at *3 (citing *Atari*, 672 F.3d at 614–15). Thus, "before comparing the two works, we must first identify 'which aspects of the [plaintiff's] work, if any, are protectable by copyright." *Nova Design Build, Inc. v. Grace Hotels, LLC*, 652 F.3d 814, 817 (7th Cir. 2011) (quoting *Tiseo Architects, Inc. v. B&B Pools Serv. and Supply Co.*, 495 F.3d 344, 348 (6th Cir. 2007)). "[T]he court must look not to the substantial similarity of the entire [work], but at the substantial similarity of the . . . protectable parts." *Haan Crafts Corp. v. Craft Masters, Inc.*, 683 F. Supp. 1234, 1243 (N.D. Ind. 1988).

"Copyright law recognizes that 'the degree of substantial similarity required to show infringement varies according to the type of work and the ideas expressed in it.'" *Schiller*, 1989 WL 152860, at *3 (quoting *Landsberg v. Scrabble Crossword Game Players, Inc.*, 736 F.2d 485, 488 (9th Cir. 1984)). "The fewer the methods of expressing an idea, the more the allegedly infringing work must resemble the copyrighted work in order to establish substantial similarity." *Id.*

a.    *The Carburetor Image*

"[S]imilarity that inevitably stems solely from the commonality of the subject matter is not proof of unlawful copying." *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 913 (2d Cir. 1980). "Copyright protection does not extend to expressions that are more or less dictated by the treatment of a particular idea, or at least standard to the treatment of a particular idea." *Le Moine v. Combined Commc'ns Corp.*, No. 95 C 5881, 1996 WL 332688, at *3 (N.D. Ill. June 13, 1996).[2] The Court has found that ABRO's image of a carburetor is copyrightable.

---

[2] *See also Yankee Candle Co., v. Bridgewater Candle Co.*, 259 F.3d 25, 36 n.6 (1st Cir. 2001) (In considering the use of food images on candle labels to indicate the candle's scent stating: "It is true that

Thus, the Court proceeds to determine whether the image of the carburetor on the Defendants' label is substantially similar to the carburetor on ABRO's label. "Where, as here, the works are attached to the parties' submissions, the court may make a visual comparison of the images to determine as a matter of law whether they are substantially similar to copyrightable material." *Gentieu v. Tony Stone Images/Chi., Inc.*, 255 F. Supp. 2d 838, 849 (N.D. Ill. 2003).

"[F]or photographs[,] a copyright does not extend to the subject matter of the image itself, but instead protects the expression of the subject as contained in such elements of the author's composition as the selection of lighting, shading, camera angle, background and perspective." *Gentieu*, 255 F. Supp. 2d at 848 (first citing *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 60 (1884); then citing *Wallace Comp. Servs., Inc. v. Adams Business Forms, Inc.*, 837 F. Supp. 1413, 1417 (N.D. Ill. 1993)). "Because the works at issue deal with the reproduction of a lifelike object—[a carburetor]—[the plaintiff] must prove that [the defendants' work] is substantially similar 'to those few aspects of the work that are expression not *required* by the idea.'" *Susan Wakeen Doll Co., v. Ashton Drake Galleries*, 272 F.3d 441, 451 (7th Cir. 2001) (quoting *Wildlife Express Corp.*, 18 F.3d at 508). It is clear that the Defendants' image of a carburetor is not substantially similar to ABRO's image as there are numerous material differences: (1) the position of each carburetor and the viewing angle are different; (2) the parts on each carburetor image have different colors; (3) the location of many of the mechanical parts on the bodies of the carburetors is different; and (4) the carburetors are not even the same model

more than one food may meet this definition: for example, cinnamon can be represented by cinnamon sticks, cinnamon rolls, or cinnamon toast. However, all that is required for application of the merger doctrine is that there be a sharply limited number of choices. We think that in the case of everyday flavors such as french vanilla, cinnamon, and spiced apple, such is the case.").

as each carburetor has parts that are not present in the other. Moreover, ABRO's image is designed to portray a lifelike image of an actual carburetor whereas the Defendants' image is a more artistic rendering. The similarities that do exist "inevitably stem[] from the commonality of the subject matter," *Durham Indus.*, 630 F.2d at 1167, and are "required by the idea," *Susan Wakeen Doll Co.*, 272 F.3d at 451. Thus, the Defendants' carburetor image does not infringe ABRO's copyright.


b.      *Instructions and Warnings*

Although the Court finds that ABRO has a valid copyright on the instructions and warnings on the label, there is still insufficient similarity between ABRO's text and the Defendants' text. ABRO has no monopoly on the method of cleaning a carburetor. "[U]sing the same words and phrases does not amount to stealing protected expression . . . especially when, as is true here, the words and phrases are necessary to describe an unprotected process." *Rozenblat*, 79 F. App'x at 906–07. Instructions and legally required warnings "by definition, are saturated with facts . . . . Here the range of possible expressions is extremely narrow." *Cooling Sys. & Flexibles v. Stuart Radiator*, 777 F.2d 485, 491–92 (9th Cir. 1985). Even "verbatim repetition of certain words in order to use the nonprotectable facts is also noninfringing." *Worth v. Selchow & Righter Co.*, 827 F.2d 569, 573 (9th Cir. 1987). In such a case, the plaintiff must show "more than the similarity that must unavoidably be produced by anyone who wishes to use and restate the unprotectable ideas contained in [the plaintiff's] work." *Landsberg*, 736 F.2d at 489. *See also FMC Corp.*, 369 F. Supp. 2d at 563 ("copyright in a factual compilation may be weak or 'thin' . . . [and] the very same facts and ideas may be . . . restated or reshuffled by second comers . . . .").

In this case, any verbatim portions of the text "dictate themselves and flow from the characteristics and intended use of the product, not from the imagination of any independent author." *Sassafras Enter., Inc. v. Roshco, Inc.*, 889 F. Supp. 343, 347 (N.D. Ill. 1995). ABRO's instructions read, in English: "Remove the air filter and spray exterior carburetor linkage. To remove gum and varnish from the throttle plate, spray short bursts into the carburetor bowl while the engine is idling." (Pl. Resp. Br. Exh. G, ECF No. 193-7.) The Defendants' instructions read, in English: "Remove air filter and spray exterior and interior of carburetor. While engine is idling spray short bursts inside carburetor intake. Also can be used as general purpose degreaser when working with varnished parts of engine." (*Id.*) Moreover, ABRO's label contains instructions specific to cleaning the automatic choke, the pcv valve, and the manifold heat controls, whereas the Defendants' instructions do not. ABRO's description of the product's use is that it "penetrates and dissolves dirt, gum, carbon, and varnish deposits that can impede moving parts." (*Id.*) Defendants' label reads that the product "penetrates, dissolves, and cleans any kind of carbon, dirt and varnish deposits which can affect moving parts." (*Id.*)

ABRO's warnings read:

> "DANGER: EXTREMELY FLAMMABLE. Contains Toluene and Acetone. Cannot be made non-poisonous. Do not puncture, incinerate or expose to heat above 120 °F (49 °C) for container may burst. Use with adequate ventilation. HARMFUL OR FATAL IF SWALLOWED. If ingested, drink 1–2 glasses of water. Do not induce vomiting. Seek medical attention immediately! SKIN and EYE IRRITANT. For eye contact, flush with water for 15 minutes. KEEP OUT OF REACH OF CHILDREN."

(*Id.*) The Defendants' warnings read:

> "Do not spray over paint. If spilled, wash immediately. FLAMMABLE! Contains Aliphatic Petroleum Distillate and Acetone. Do not puncture, incinerate or expose to heat about 120 °F (49 °C). Use with adequate ventilation. If ingested, do not induce vomiting! Drink 1–2 glasses of water and seek medical attention

immediately. For eye contact flush with water for 15 minutes. KEEP OUT OF REACH OF CHILDREN!"

(*Id.*)

ABRO and the Defendants both also submitted translations of the Russian text appearing on their products, which demonstrate similar textual differences between the parties' labels. (*See* Def. Br. Exh. 20, ECF No. 25; Pl. Resp. Br. Exh. G, ECF No. 193-7.) Although there are some slight discrepancies between the two translations, both demonstrate several differences between the sets of instructions and warnings. For example, ABRO's label includes the warning: "For skin, eye contact, or spills onto painted surface, flush with water immediately." (Pl. Resp. Br. Exh. G.) In contract, the Defendants' label includes the warning: "For contact with skin, eyes, or painted surfaces, flush the affected area with large amounts of water immediately." (*Id.*)

The Court finds that there are clear and substantial differences between the parties' instructions and warnings. Only a small portion of the Defendants' text is verbatim, and that portion of the text is necessary to communicate the required warnings and describe to the consumer how to use the product, a process on which ABRO does not hold a monopoly. Thus, ABRO cannot show that the similarities between the two labels do not exceed those which "must unavoidably be produced" in order to communicate the unprotectable idea.

c.      *Carb & Choke Cleaner Label*

Despite the Copyright Office's express finding that ABRO's label as a whole was not copyrightable as a compilation, ABRO spends a significant amount of time arguing over the similarity between the two labels rather than the similarities between the copyrightable aspects of

the labels. But, even had the Court found that ABRO's label was independently copyrightable, the Court could not find sufficient similarity between the two labels.

Admittedly, both labels use a general color scheme of red, white, and blue. But this is hardly an uncommon color scheme. (*See* Def. Br. Exh. 17, 21–22, ECF Nos. 177-22, 26–27; ECF No. 7-5, ABRO Resp. Br. at 5, ECF No. 193 (Google search); ABRO Resp. Br. Exh. F, ECF No. 193-6).) There are also several other important differences. For example, the parties use different fonts; the Defendants' label sets the picture of the carburetor off with a tear-drop shaped background of a darker blue whereas ABRO's label features no such set off; and at the bottom of the front of the Defendants' label, there is only a slogan in addition to the part number and package volume, whereas ABRO's label utilizes the same portion of the label to advertise some of the required warnings. Moreover, as described above, there are significant differences in the images of the carburetors used by each company. "Given the economic and functional constraints on the designers and the vast body of similar designs in the public domain, these many differences are not trivial." *Design Basics*, 858 F.3d at 1103.

Because the Court cannot find substantial similarity between any component of ABRO's works and the Defendants' works, the Defendants are entitled to judgment as a matter of law on the Plaintiff's claims for copyright infringement and, by extension, the Plaintiff's claims for vicarious liability. Because the Defendants are entitled to judgment as a matter of law, ABRO cannot recover damages, so the Defendants' Motion to Strike ABRO's Expert Report on Damages is moot.

**B. The Defendants' Motion for Attorney's Fees**

The Defendants have also moved for an award of attorney's fees in this case to compensate them for the expenses associated with defending a copyright infringement lawsuit. In a copyright infringement case, "the court, in its discretion may allow the recovery of full costs. . . [and] may also award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505. The Seventh Circuit has held that the prevailing defendants in a copyright case are entitled to a strong presumption in favor of receiving attorney's fees. *Eagle Servs. Corp. v. H2O Indus. Servs., Inc.*, 552 F.3d 620, 624 (7th Cir. 2008). However, attorney's fees are not to be awarded as a matter of course. "[A]ttorney's fees are to be awarded to prevailing parties only as a matter of the court's discretion." *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 (1994). Importantly, the prevailing party need not prove bad faith or exceptional circumstances to obtain an award of attorney's fees. *See FASA Corp. v. Playmates Toys, Inc.*, 108 F.3d 140, 142 (7th Cir. 1997); *Budget Cinema, Inc. v. Watertower Assocs.*, 81 F.3d 729, 732 (7th Cir. 1996) ("Although there is little indication of actual bad faith . . . , the record demonstrates quite clearly that [the plaintiff's] case against defendants was objectively unreasonable, both factually and legally."). The Supreme Court has enumerated a non-exclusive list of factors to consider, including "frivolousness, motivation, objective unreasonableness[,] and the need in particular circumstances to advance considerations of compensation and deterrence." *Fogerty*, 510 U.S. at 534 n.19. The objective reasonableness of the parties' litigating positions is to be given substantial—but not controlling—weight. *See Kirtsaeng v. John Wiley & Sons, Inc.*, 136 S. Ct. 1979, 1987–89 (2016). In the Seventh Circuit, the most important considerations in deciding whether to award attorney's fees are:

> the strength of the prevailing party's case and the amount of damage or other relief the party obtained. If the case was a toss-up and the prevailing party obtained

generous damages, or injunctive relief of substantial monetary value, there is no urgent need to add an award of attorneys' fees. But if at the other extreme the claim or defense was frivolous and the prevailing party obtained no relief at all, the case for awarding attorneys' fees is compelling. We said that as a consequence of the successful defense of an infringement suit the defendant is entitled to a "very strong" presumption in favor of receiving attorneys' fees, in order to ensure that an infringement defendant does not abandon a meritorious defense in situations in which the cost of vindication exceeds the private benefit to the party. For without the prospect of such an award, [the defendant] might be forced into a nuisance settlement or deterred altogether from exercising [its] rights.

*Klinger v. Conan Doyle Estate, Ltd.*, 761 F.3d 789, 791 (7th Cir. 2014) (first citing *Assessment Tech. of Wis., LLC v. WIREdata, Inc.*, 361 F.3d 434, 436–37 (7th Cir. 2014); then citing *DeliverMed Holdings, LLC v. Schaltenbrand*, 734 F.3d 616, 625–26 (7th Cir. 2013)). Thus, "[w]hen the prevailing party is the defendant, who by definition receives not a small award but no award, the presumption in favor of awarding fees is very strong." *Assessment Tech. of Wis.*, 361 F.3d at 437.

The Court finds that the Defendants are entitled to attorney's fees as to ABRO's copyright claims. Because the Court has granted summary judgment on these claims, the Defendants are the prevailing party, and they are entitled to a "very strong" presumption in favor of awarding fees. Moreover, the Court finds this case far from a "toss-up"; rather, it borders on frivolous. ABRO has been hard pressed to find any viable argument to support its claims against the Defendants. ABRO proceeded with this case knowing that it did not have a registered copyright on the label, yet much of its argument consisted of comparing the similarity of the two labels as a whole instead of the elements of the label that were potentially copyrightable. Not only were these arguments unconvincing, they were objectively unreasonable. As to the components of the label that the Court did find copyrightable, it is clear that there was no substantial similarity between the parallel components of the Defendants' label. It is difficult to imagine an image of a carburetor (that retained any basis in reality) that is more disparate from

ABRO's image than the Defendants' image. Further, although instructions and warnings are entitled to (very narrow) protection, there are numerous and significant differences between ABRO's text and the Defendants' text, and it was objectively unreasonable to argue otherwise. *See Franklin Mach. Prod. v. Heritage Food Serv. Equip., Inc.*, No. 1:06-CV-379, 2008 WL 687300, at *2 (N.D. Ind. Mar. 11, 2008) (supporting award of attorney's fees in part because the two products had "glaring differences"). ABRO's arguments on these points, therefore, were an unabashed attempt to copyright an idea.

The Court has considered the remaining two non-exclusive considerations approved of in *Fogerty*—motivation and the need in particular circumstances to advance considerations of compensation and deterrence—and finds that they do not weigh in ABRO's favor. At best, they are neutral.

Given the "very strong" presumption of awarding attorney's fees to a prevailing defendant in a copyright case, that the Defendants need not go so far as to prove bad faith or exceptional circumstances, and that the Court finds no evidence or argument that weighs in ABRO's favor on this issue, the Court will award the Defendants reasonable attorney's fees for defending against ABRO's copyright infringement claim.

## C. Zorin and Babenchik's Counterclaims for Breach of Fiduciary Duty Against ABRO

ABRO has moved for summary judgment on Zorin and Babenchik's counterclaims for breach of fiduciary duty. There appears to be no dispute that Indiana substantive law applies to these claims. A claim for breach of fiduciary duty requires the proof of three elements: (1) the existence of a fiduciary relationship, (2) a breach of the duty owed by the fiduciary to the beneficiary, and (3) a harm to the beneficiary. *York v. Fredrick*, 947 N.E.2d 969, 978 (Ind. Ct.

App. 2011). Contractual agreements do not automatically give rise to a fiduciary relationship. *Morgan Asset Holding Corp. v. CoBank, ACB*, 736 N.E.2d 1268, 1273 (Ind. Ct. App. 2000). (citing *Comfax Corp. v. N.A. Van Lines, Inc.*, 587 N.E.2d 118, 125–26 (Ind. Ct. App. 1992)). However, fiduciary relationships arise when parties enter into a partnership. "The fiduciary duty between partners requires each partner to exercise good faith and fair dealing in partnership transactions and toward co-partners." *Ruse v. Bleeke*, 914 N.E.2d 1, 11 (Ind. Ct App. 2009). ABRO argues that Zorin and Babenchik's claims for breach of fiduciary duty must fail because there was no partnership between the parties. "Generally speaking, the question of whether a relationship of partnership, principal and agent, or master and servant exists is one of fact." *Musgrave v. Madonna*, 341 N.E.2d 789, 790 (Ind. Ct. App. 1976).

A partnership is an association of two or more persons to carry on a business for profit as co-owners. Ind. Cod. § 23-4-1-6. To establish a partnership, "there must be (1) a voluntary contract of association for the purpose of sharing the profits and losses, as such, which may arise from the use of capital, labor, or skill in a common enterprise; and (2) an intention on the part of the principals to form a partnership for that purpose." *Bacon v. Christian*, 111 N.E. 628, 630 (Ind. 1916).

"The intention to form a partnership is determined by examining all the facts of the case and the conduct of the parties." *Weinig v. Weinig*, 674 N.E.2d 991, 995 (Ind. Ct. App. 1996). "[I]t is the substance, and not the name of the arrangement between them which determines their legal relation toward each other." *Driscoll v. Sullivan*, 115 N.E. 331, 332–33 (Ind. 1917); *see also Watson v. Watson*, 108 N.E.2d 893, 895 (Ind. 1952). Even if the parties "expressly stipulated in their agreement that they were not to become partners," if they behave as partners,

the law will treat them as such. *Bacon*, 111 N.E. at 630; *see also Life v. F.C. Tucker Co.*, 948 N.E.2d 346, 3 (Ind. Ct. App. 2001).

Sharing profits is indicative of a partnership, although Indiana courts recognize a difference between sharing profits and sharing gross returns. *See, e.g.*, *Life*, 948 N.E.2d at 349 ("receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner . . . . However, the sharing of gross returns does not of itself establish a partnership . . . ."). The sharing of losses is also relevant to the determination of whether the parties intended to enter into a partnership. *See, e.g.*, *Endsley v. Game-Show Placements, Ltd.*, 401 N.E.2d 768, 770 (Ind. Ct. App. 1980). Actual sharing of losses need not occur. *See, e.g.*, *Hansford v. Maplewood Station Bus. Park*, 621 N.E.2d 347, 350 (Ind. Ct. App. 1993); *Western Assur. Co.*, *v. Connors*, 830 F. Supp. 1191, 1196 (S.D. Ind. 1993).

ABRO argues that it never intended to enter into a partnership with either Zorin or Babenchik and that there is no evidence that the parties ever behaved as partners.

The parties have been in a decades-long business relationship. Zorin and ABRO jointly developed marketing plans for Russia, and Zorin was heavily involved in advertising and policing ABRO's intellectual property in Russia. The parties shared the costs of such advertising and business development. No new distributors of ABRO's product were added in Russia without the approval of Zorin, and ABRO directed any such inquiries to Zorin for final decisions. For distributors that Zorin recruited, Zorin agreed to act as guarantor of the distributors' payments to ABRO. ABRO had a similar arrangement with Babenchik. There is also evidence that the parties referred to themselves as "partners," although they dispute the intent behind the use of the word.

There is a genuine dispute as to whether the compensation Zorin and Babenchik received was commission-based or profits-based. The parties dispute whether payments to the Defendant came from ABRO's profit or if the payments were a payable of ABRO that reduced ABRO's profit. ABRO's accounting procedures are a question of fact for the jury. Moreover, there is some evidence of profits-based compensation. For example, the parties don't dispute that Zorin was to receive 3% of the profits when sales exceeded $25 million dollars. Although ABRO argues otherwise, Babenchik's use of the word "commissions" in his deposition, much like the use or non-use of the word "partners," [3] is not dispositive of the issue. Moreover, Babenchik stated in his deposition that he was not sure that "commissions" was an accurate way to describe the compensation agreement.

Moreover, the Court does not find that it is significant that Zorin and Babenchik never actually had to share in the losses. It does not appear that ABRO disputes that both Zorin and Babenchik agreed to act as guarantors in the case of a distributor's default. Simply because their ability to fulfill their agreements was untested does not mean that there was no agreement to share in the losses.

A reasonable trier of fact could conclude that the parties had entered into a partnership for which they owed each other fiduciary duties. None of the parties have addressed whether Zorin and Babenchik can demonstrate the remaining elements of a breach of fiduciary duty claim. Thus, the Court denies summary judgment as to Zorin and Babenchik's counterclaims for breach of fiduciary duty.

---

[3] ABRO places weight on Babenchik's use of the word "commissions" during his deposition in order to prove the exact nature of the compensation arrangement but, at the same time, ignores Babenchik's use of the word "partnership" in the same sentence as it pertains to the nature of the relationship between the parties.

**D.      Zorin and Babenchik's Counterclaims for Breach of Contract Against ABRO**

ABRO has also moved for summary judgment against Zorin and Babenchik as to their counterclaims for breach of contract. To recover for breach of contract, a plaintiff must prove that: (1) a valid contract existed between the parties; (2) the defendant failed to perform its part of the contract; and (3) the plaintiff was damaged by the defendant's breach. *Strong v. Commercial Carpet Co.*, 322 N.E.2d 387, 391 (Ind. Ct. App. 1975). A party breaches a contract when it fails to perform all the obligations that it has agreed to undertake. *Worrell v. WLT Corp.*, 653 N.E.2d 1054, 1057 (Ind. Ct. App. 1995).

*1.      Zorin's Contract With ABRO*

ABRO contends that Zorin's breach of contract claim must fail because any contract between the parties would be unenforceable under the Statute of Frauds. Indiana Code § 32-21-1-1(b) provides that a "person may not bring . . . [a]n action involving any agreement that is not to be performed within one (1) year from the making of the agreement," unless "the promise, contract, or agreement on which the action is based, is in writing and signed by the party against whom the action is brought or by the party's authorized agent." Ind. Code § 32-21-1-1(b)(5). "[A]n agreement required to be in writing must completely contain the essential terms without resort to parol evidence in order to be enforceable." *Reich v. Lincoln Hills Christian Church, Inc.*, 888 N.E.2d 239, 243 (Ind. Ct. App. 2008).

ABRO argues that Zorin cannot satisfy the Statute of Frauds because the alleged contract was to last longer than a year and was not in writing and signed by ABRO. Zorin asserts that the statute of frauds does not apply in this case because ABRO is "holding hostage the very evidence that satisfies the Statute of Frauds." (Def. Resp. Br. 9.) That is, Zorin argues that if ABRO had

produced the emails that it had been instructed by the Court to produce, Zorin would have been able to show the essential terms of the asserted agreement in writing.

Previously, the Court granted Zorin's Motion to Compel ABRO to produce the emails in dispute. (ECF No. 106.) But, the Court also required Zorin to produce to ABRO the "necessary encryption key." The Court instructed that if there were further disputes regarding the production of these emails, the parties were to meet and confer, after which either party could file a motion with the Court to resolve any remaining issues. Zorin argues that he complied with the Court's order by providing ABRO with "the public part of the encryption key." However, both a "public" *and* a "private" encryption key were necessary to access the emails Zorin sought, and Zorin refused to produce his private encryption key. Zorin states that he attempted to work out an arrangement that would assuage his concerns about turning over his private encryption key but that ABRO refused to cooperate. Thus, Zorin argues, ABRO withheld discovery in bad faith and should not now be able to assert the Statute of Frauds when any evidence to defeat such a claim remains within ABRO's possession.

Although Zorin's concerns may well have had merit, the fact remains that Zorin did not comply with the Court's Order; he failed to provide to ABRO the *necessary* encryption key that would have permitted ABRO to access and produce the requested emails. When it became clear that ABRO was not amenable to Zorin's suggestions for complying with the Court's Order, Zorin could have—and should have—filed a motion with the Court. Instead, he waited until summary judgment to contest the issue. This is an impermissible attempt to inject a discovery dispute into the summary judgment context. *See Helget v. City of Hays, Kan.*, 844 F.3d 1216, 1226–27 (10th Cir. 2017); *Lauth v. Covance, Inc.*, 155 F. Supp. 855, 873 (S.D. Ind. 2016) (quoting *Malik v. Galcon Holding, LLC*, 675 F.3d 646, 649 (7th Cir. 2012)); *U.S. ex rel. Tucker*

*v. Nayak*, No. 06-CV-662, 2009 WL 1684484, at *3 (S.D. Ill. June 15, 2009). "What [Zorin] [cannot] do [is] choose to do nothing and then hope to hold [ABRO] accountable for its position in a discovery dispute in the context of a summary judgment motion." *Pruet v. Fayette Reg'l Health Sys.*, No. 1:12-CV-635, 2013 WL 5236609, at *1 (S.D. Ind. Sept. 17, 2013). "[I]t is [Zorin] who wants the documents to rebut [ABRO's] defense. It was therefore [Zorin's] obligation to use the discovery tools available to it—including seeking the assistance of the Court—to obtain the [requested] documents." *Id.* Therefore, the Statute of Frauds applies to the alleged contract between the parties, and Zorin has not produced a writing to satisfy it.

However, Zorin need not produce a writing to satisfy the Statute of Frauds if he can establish promissory estoppel. Indiana Courts apply a promissory estoppel exception to mitigate the harsh results that often flow from the application of the Statute of Frauds. To show promissory estoppel, "the party must show that the other party's refusal to carry out the terms of the agreement has resulted not merely in a denial of the rights which the agreement was intended to confer, but the infliction of an unjust and unconscionable injury and loss." *Brown v. Branch*, 758 N.E.2d 48, 52 (Ind. 2001). This is "founded on the vital principle that he who by his language or conduct leads another to do, upon the faith of an oral agreement, what he would not otherwise have done, and changes his position to his prejudice, will not be allowed to subject such a person to loss or injury, or to avail himself of that change to the prejudice of such other party." *Dupont Feedmill Corp. v. Standard Supply Corp.*, 395 N.E.2d 808, 811 (Ind. Ct. App. 1979) (quoting *Hurd v. Ball*, 143 N.E.2d 458, 466 (Ind. Ct. App. 1957) (en banc)). However, "neither the benefit of the bargain itself, nor mere inconvenience, incidental expenses, etc. short of a reliance injury so substantial and independent as to constitute an unjust and unconscionable injury and loss are sufficient to remove the claim from the operation of the Statute of Frauds."

*Brown*, 758 N.E.2d at 52 (internal quotation omitted). A single affidavit regarding the impact of future relationships with third parties may be enough to survive summary judgment. *See Dupont*, 395 N.E.2d at 811.

A reasonable trier of fact could find that ABRO is estopped from asserting the Statute of Frauds to defend against Zorin's claim for breach of contract. Zorin has presented evidence that his business structures, investments, and implementation of strategies for the Russian market were made in reliance on his continuing relationship with ABRO and that this reliance was detrimental to his ability to compete in the Russian market, specifically alleging "complete destruction" of Zorin's business, which was based on selling ABRO products. A reasonable trier of fact could conclude that, under the circumstances, Zorin's injury was so substantial as to be unjust or unconscionable. Drawing all inferences in favor of Zorin, the Court cannot say as a matter of law that the Statute of Frauds defeats Zorin's breach of contract claim.

**2.      *Babenchik's Contract With ABRO***

ABRO contends that Babenchik's claim for breach of contract must fail because (1) any contract ABRO entered into was with Krepost, not Babenchik, and (2) any contract ABRO entered into was terminable at-will. First, the Court finds that there is an issue of material fact as to whether there was a contractual relationship with Babenchik personally. Babenchik has produced evidence that he identified himself with his company during transactions with ABRO. Moreover, in 2014, Babenchik indicated that he was extricating himself from his relationship with ABRO but leaving Krepost's relationship with ABRO intact. Drawing all inferences in his favor, a reasonable trier of fact could determine that there was a contract between Babenchik and ABRO.

"[A] contract providing for continuing performance and which has no termination date, or which provides that it will last indefinitely, is terminable at will by either party." *Marksill Specialties, Inc. v. Barger*, 428 N.E.2d 65. 69 (Ind. Ct. App. 1981). "[S]uch a contract is enforceable until terminated, but there is no liability for the termination itself." *Black Agents & Brokers Agency, Inc. v. Near N. Ins. Brokerage, Inc.*, No. 2:01-CV-419, 2004 U.S. Dist. LEXIS 17945, at *22 (N.D. Ind. June 7, 2004) (citing *House of Crane v. Fendrich*, 256 N.E.2d 578, 579 (Ind. Ct. App. 2000)).

The failure to specify a termination date does not necessarily mean a contract will last indefinitely if it "contain[s] a provision that sets out a condition which would terminate [a party's] obligation." *Marksill Specialties*, 428 N.E.2d at 69 (discontinuance of the sale of certain goods provision was a termination provision). That a contract is "at will" does not deprive a party of all remedy upon its termination by the other party. As with the Statute of Frauds, a party may be able to recover damages if he can demonstrate promissory estoppel. *See, e.g.*, *Knauf Fiber Glass, GmbH v. Stein*, 615 N.E.2d 155, 122 (Ind. Ct. App. 1993) (rev'd on other grounds). Moreover, a party can recover damages if that party can establish there was no actual termination of the contract. *See Rogier v. Am. Testing and Eng'g Corp.*, 734 N.E.2d 606, 616–17 (Ind. Ct. App. 2000).

ABRO quotes from Indiana Code § 26-1-2-309(2): "Where the contract provides for successive performances but is indefinite in duration, it is valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party." Thus, according to ABRO, it had the right to terminate any alleged contract at any time.[4] ABRO leaves out the next sentence

---

[4] The Defendants dispute ABRO's contention that there were no "end" conditions or time limits. For example, the "ABRO-Babenchik-Orient Invest" deal was to last for the duration of ABRO's written agreement with Orient Invest. Although ABRO points out that the Defendants attributed an incorrect date to the contract, mistakenly believing that, as of the signing of the contract, there could be no termination

in the code, however, which requires: "Termination of a contract by one (1) party, except on the happening of an agreed event, requires that reasonable notification be received by the other party . . . ." Ind. Cod. § 26-1-2-309(3). Whether a party has given reasonable notification is a question of fact.

Construing all facts and inferences in the favor of the non-moving party, whether there were termination provisions in any of the alleged contracts and whether there was reasonable notification of ABRO's intent to terminate the alleged contracts are genuine issues of material fact, and ABRO is not entitled to summary judgment.

## E.    The Defendants' Counterclaim for Tortious Interference Against ABRO

ABRO also moves for summary judgment on the Defendants' counterclaim for tortious interference with existing or prospective business relationships. The elements of a claim for tortious interference with a business relationship are: "(1) the existence of a valid relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from the defendant's wrongful interference with the relationship." *Miller v. Cent. Ind. Cmty. Found., Inc.*, 11 N.E.3d 944, 961 (Ind. Ct. App. 2014) (quoting *Levee v. Beeching*, 729 N.E.2d

---

until at least December 2015, even if there could have been a termination, there is no evidence that there was such a termination. Regardless, the written agreement set out a condition that would terminate the parties' obligations. *See Marksill*, 428 N.E.2d at 69 ("Although a date is not specified, the representative agreement does contain a provision that sets out a condition which would terminate [the Plaintiff's] obligations."). Moreover, another agreement that required ABRO to continue sales to Krepost (or any other Babenchik company) explicitly set a termination date of January 27, 2017. (*See* Def. Resp. Br. Exh. K, ECF No. 189-15.) This demonstrates that some contracts between the parties did, in fact, have termination dates and/or conditions, and a reasonable trier of fact could determine that other oral contracts that Babenchik alleges exist contain similar conditions. The terms of an oral contract are a matter of fact to be decided by the jury. *Tuthill Corp., Fill-Rite Div. v. Wolfe*, 451 N.E.2d 72, 77 (Ind. Ct. App. 1983).

215, 222 (Ind. Ct. App. 2000)). "[O]ne who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another." *Hoffman v. Roberto*, 578 N.E.2d 701, 710 (Ind. Ct. App. 1991).

ABRO argues that Zorin and Babenchik have not established that ABRO knew of any existing or prospective business relationships.[5] To the extent there was any interference by ABRO with the Defendants' prospective relationships, ABRO argues that it had legitimate business reasons for its actions and that those actions were therefore justified. Moreover, ABRO argues that statements it made to the suppliers with which the Defendants allege ABRO interfered and the filing of this lawsuit are protected by a litigation privilege accorded to statements made during judicial proceedings and therefore cannot be the basis for a tortious interference action.

The Defendants respond that ABRO is entitled to no such immunity for any statements it made to the Defendants' prospective suppliers or for the filing of this lawsuit. The Defendants argue that there are disputed facts as to whether ABRO's conduct was illegal or criminal, whether ABRO acted with malice, whether ABRO knew of the Defendants' prospective relationships with Quest and 1NEW Trade's China-based suppliers, and whether ABRO's actions against Quest and 1NEW Trade's China-based suppliers were justified.

---

[5] ABRO does not appear to make the same argument as to 1NEW Trade.

## 1. *Existence of a Business Relationship*

Zorin, Babenchik, and 1NEW Trade have all alleged that ABRO tortiously interfered with prospective and/or existing business relationships. The relevant prospective and/or existing relationships at issue are with Quest and 1NEW Trade's China-based suppliers, specifically Join Leader and Shenzen Rainbow. ABRO argues that there is no evidence that Zorin and Babenchik were pursuing business relationships in their individual capacities, and the Court agrees with ABRO as to Babenchik. There is no evidence of record of any personal communications between Babenchik and either Quest or 1NEW Trade's China-based suppliers. However, the Court finds that there is a genuine issue of material fact as to whether Zorin acted in his individual capacity to form business relationships. Zorin and Babenchik have both submitted affidavits stating that 1NEW Trade was not originally created to sell automotive products. 1NEW Trade was not incorporated until October 5, 2013, and the meeting(s) between Zorin and Quest occurred sometime in the fall of 2013. Drawing all inferences in the Defendants' favor, a reasonable trier of fact could conclude that there were prospective or existing business relationships in which Zorin was engaged in his individual capacity for at least some period of time before Zorin and Babenchik decided to use 1NEW Trade as a vehicle to sell the product at issue.

## 2. *ABRO's Knowledge of the Defendants' Relationships*

ABRO argues that it had no knowledge of the business relationships or prospective business relationships between the Defendants and Quest and 1NEW Trade's China-based suppliers. However, there is evidence that ABRO asked these suppliers not to do business with

the Defendants. Thus, there is at least a question of fact as to whether ABRO knew of the business relationships or prospective business relationships.

### 3.    *Interference*

It does not appear that the parties dispute whether ABRO interfered in the Defendants' business relationships or prospective business relationship other than ABRO's argument that it was unaware of those relationships. With respect to Quest, the Defendants argue that ABRO tortiously interfered by filing the instant lawsuit. With respect to 1NEW Trade's China-based suppliers, the Defendants argue that ABRO interfered by threatening economic sanctions and other litigation. However, ABRO asserts that it is protected by a litigation privilege.

With respect to Quest, ABRO argues that a "litigation privilege" attaches to the filing of this lawsuit. "Indiana law has long recognized an absolute privilege that protects all relevant statements made in the course of a judicial proceeding." *Van Eaton v. Fink*, 697 N.E.2d 490, 494 (Ind. Ct. App. 1998). This privilege attaches to "torts related to defamation, or relying upon defamatory statements as proof of wrongdoing." *Estate of Mayer v. Lax, Inc.*, 998 N.E.2d 238, 249 (Ind. Ct. App. 2013). Thus, in a tortious interference action, if the alleged interference is a defamatory statement made in the course of a judicial proceeding, such statement will be subject to the litigation privilege. However, the Court is hard-pressed to see how the litigation privilege revolving around defamatory statements should extend to the actual filing of the lawsuit when that lawsuit is filed in bad faith, as the Defendants have alleged. Otherwise, parties would be free to interfere with business relationships by filing frivolous or malicious lawsuits and then claiming immunity. "Litigation is a powerful weapon, and when instituted in bad faith for the

purpose of causing damage or loss, it is a wrongful method of interference." *Hughes v. Houston N.W. Med. Ctr., Inc.*, 680 S.W.2d 838, 842 (Tex. App. 1980). *See also Int'l Floor Crafts, Inc. v. Adams*, 477 F. Supp. 2d 336, 340 (D. Mass. 2007) ("A party can, however, be held liable for tortious interference on the basis of the filing of a lawsuit if it is alleged that the suit was filed for the ulterior *purpose* of interfering with a prospective business relationship."); *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1269–70 (5th Cir. 1991) ("We see no principled basis for affording the bad faith assertion of rights any greater protection merely because the assertion of rights occurs inside the courthouse rather than on the courthouse steps or elsewhere. That a civil complaint carries with it the imprimatur of the docket clerk's seal does not, in our view, make a bad faith lawsuit any less tortious or any more privileged.").

With respect to 1NEW Trade's China-based suppliers, against which ABRO has not filed a lawsuit, ABRO asserts that there remains a "qualified litigation privilege." That is, a party has a qualified privilege to statements "made in good faith . . . in which the party making the communication has an interest or in reference to which he has a duty, either public or private, either legal, moral, or social, if made to a person having a corresponding interest or duty." *Van Eaton*, 697 N.E.2d at 495. The speaker loses its qualified privilege if "the communicator was primarily motivated by ill will in making the statement." *Id.* ABRO disputes that its statements to the China-based suppliers constituted a threat of economic sanctions[6] and characterizes the

---

[6] Moreover, the statements at issue regarding the threat of "economic sanctions" are unrelated to the lawsuits that ABRO threatened to file against 1NEW Trade's China-based suppliers, i.e., intellectual property infringement, and are therefore not eligible for the privilege. *See Van Eaton*, 697 N.E.2d at 495 ("[T]he rule also applies . . . , provided that, the communication is related to the proceeding . . . ."). Thus, even were the jury to find that ABRO's other statements were privileged, a reasonable trier of fact could determine that the unprivileged statements constituted interference.

exchange as one designed only to protect its intellectual property. However, based on the threat to cease business with these suppliers if they sold anything—not just the allegedly infringing product—to the Defendants, a reasonable trier of fact could find that ABRO was primarily motivated by ill will.

Moreover, some states have denied the privilege where the communications were not preliminary to proposed judicial proceedings that the party actually intended to commence. *See, e.g.*, *Sriberg v. Raymond*, 345 N.E.2d 882, 884 (Mass. 1976) ("[S]uch proceeding is not to be employed as a shield of immunity for defamation where there is not serious consideration of suit."); *cf. Assay v. Hallmark Cards, Inc.*, 594 F.2d 692, 698 (8th Cir. 1979) ("Otherwise, to cause great harm and mischief a person need only file false and defamatory statements as judicial pleadings and then proceed to republish the defamation at will under the cloak of immunity."). Whether ABRO's communications to 1NEW Trade's China-based suppliers, were contemplated in good faith or whether there was actual intent to litigate against them is a question of fact for the jury.

Therefore, the Court cannot say as a matter of law that ABRO's actions and statements are protected by a litigation privilege.

### 4. *Without Justification*

Justification is not an affirmative defense; rather it is the claimant that must prove the lack of justification. *Bradly v. Hall*, 720 N.E.2d 747, 751 n.4 (1999). Indiana courts have considered the following factors in determining whether a party's conduct was justified:

> (a) the nature of the defendant's conduct; (b) the defendant's motive; (c) the interests of the plaintiff with which the defendant's conduct interferes; (d) the interests sought to be advanced by the defendant; (e) the social interests in protecting the freedom of action of the defendant and the contractual interests of the plaintiff; (f) the proximity or remoteness of the defendant's conduct to the interference; and (g) the relations between the parties.

*Miller*, 11 N.E.3d at 961 (quoting *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1235 (Ind. 1994)). A party is justified in interfering with a third party's contract if it "asserts in good faith a legally protected interest of [its] own . . . if the actor believes that [its] interest may otherwise be impaired or destroyed by the performance of the contract or transaction." *Morgan Asset Holding Corp.*, 736 N.E.2d 1268 at 1273 n.3. A party can also successfully bring a claim for tortious interference by showing a "per se wrongful act or . . . a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another." *Hoffman*, 578 N.E.2d at 710. "[T]he overriding question in determining whether there is an absence of justification is whether the defendant's conduct was fair and reasonable under the circumstances." *Winkler*, 638 N.E.2d at 1235. Indiana courts have found "this inquiry to be so highly fact sensitive that [they] conclude it is best answered by a factfinder." *Allison v. Union Hosp., Inc.*, 883 N.E.2d 113, 121 (Ind. Ct. App. 2008).

ABRO cites *Bilimoria Comput. Sys., LLC v. Am. Online, Inc.*, 829 N.E.2d 150, 156–57 (Ind. Ct. App. 2005), for the proposition that so long as ABRO can demonstrate a legitimate business interest, its conduct was justified. But, the "legitimate business purpose" at issue in *Bilimoria* "was not exclusively directed to the injury and damage of [the plaintiff]," which is what the Defendants assert in this case. *Id.* at 157. Had ABRO legitimately wanted to protect its intellectual property as against the Defendants, ABRO could have sent a cease and desist letter. As to ABRO's suppliers, ABRO could have informed them of its specific intellectual property concerns and instructed them to refrain from future infringement. But, ABRO's communications

and instructions went beyond intellectual property concerns. The evidence shows that ABRO instructed its suppliers not to do *any* business[7] with the Defendants, regardless of whether the goods potentially infringed ABRO's intellectual property.[8] Should ABRO's suppliers do *any* business with the Defendants, they would do so at the risk of losing ABRO's business. This is not an instance where ABRO was fairly competing to solicit the Defendants' customers. This is an instance where ABRO's actions had the potential to cut off the Defendants' ability to compete at all. *Cf. Zimmer v. Stryker Corp.*, 2014 WL 3866454, at *7 (N.D. Ind. Aug. 6, 2014) (finding that the situation was not that of competing for customers but rather was an instance of the defendant poaching the services of an employee from the plaintiff). A reasonable trier of fact could find that interfering with the Defendants' opportunity to purchase non-competing or non-infringing goods from ABRO's suppliers had no legitimate business purpose.[9] Therefore, the Court cannot find as a matter of law that ABRO's actions were justified.

---

[7] *See, e.g.* Def. Resp. Br. Exh. P, ECF No. 189-21 (reminder email from Molnar to Molnar, dated October 16, 2014, subject line "Write e-mail to all suppliers") ("1NEW coming. If you sell to them we will consider moving our business to another factory."); Def. Br. Exh. 29a, ECF No. 178-3 (email from Molnar to Shenzhen Rainbow) ("I found out today that 1NEW just received new product this month. 1NEW-Clean All and 1NEW-Foaming Tire Cleaner. Please confirm that your factory did not produce these two products . . . . In your e-mail on October 22nd you said that you would not continue to do business with these people."); Def. Br. Exh. 29b, ECF No. 178-4 (email from Molnar to Shenzhen Rainbow) ("We trust that you will no longer be doing business with this 1NEW brand and the company that owns it."); Def. Br. Exh. 29c, ECF No. 178-5 (letter from ABRO to Join Leader, dated December 6, 2013) ("We would ask that you do not entertain any inquiries from Igor Zorin."); Def. Resp. Br. Exh. S, ECF No. 192-9 (email from Molnar dated November 22, 2013) ("By the way, I have instructed them not to sell to [Zorin]. I am also telling you not to sell to [Zorin]. I will tell Krepost the same. I spoke with [Baranay] about this and we don't want any association with him."); Def. Br. Exh. 31, ECF No. 178-6 (email from Molnar to various suppliers) ("It has come to my attention that Igor Zorin has started to import gasket makers, spray paints, thread lockers, and antifreeze under a different label "1New"? . . . . This does not change anything pertaining to our strategy moving forward. Please remember that no one is allowed to sell Igor any Abro products.")

[8] Def. Resp. Br., Exh. O, ECF No. 189-20 (Email from Baranay to Molnar) ("From [1NEW's] website, all other products are made in China and look nothing like ours. Particularly the spray paint.").

[9] The Defendants also point to another Indiana decision wherein the court rejected the "malicious standard" as "the appropriate standard within which to analyze the absence of justification. *Coca-Cola*

Because the Court finds genuine issues of material fact, the Court must deny ABRO's

Motion for Summary Judgment on Zorin and 1NEW's tortious interference claims. However,

because the Court finds no evidence of record that Babenchik had any personal business

relationships or prospective business relationships with third parties with which ABRO

interfered, the Court will grant ABRO's Motion for Summary Judgment as to Babenchik's

tortious interference claim.


**F.      Zorin's and Babenchik's Tortious Interference Claims Against Baranay**

Zorin and Babenchik allege that Baranay tortiously interfered with their business

relationships with ABRO. Baranay argues that as the president of ABRO, he is immune for

actions taken in the scope of his employment. He also argues that to the extent he could be found

to have tortiously interfered, his actions were justifiable.

The personal liability of corporate officers and shareholders is determined by common

law rules of agency. *Winkler*, 638 N.E.2d at 1231 (citing *Ind. Dep't of Pub. Welfare v. Chair

Lance Serv.*, 523 N.E.2d 1373, 1377 (Ind. 1988)). "It is a matter of black-letter law that where

the agent acted within the scope of the agent's authority in forming a contract on behalf of the

principal, the remedy of one seeking to enforce the contract is against the principal and not the

agent." *Id.* at 1231. "Although a corporation acts only through its agents, officers, shareholders,

---

*Co. v. Babyback's Int'l, Inc.*, 806 N.E.2d 37, 51 (Ind. Ct. App. 2004) (vacated on other grounds). The
*Coca-Cola* court rejected the plaintiff's assertion that "any actions taken to protect its name" including
withdrawing business from its suppliers due to their association with the defendant "[were] justified as a
matter of law." *Id.* Rather, the Court found that "whether [the plaintiff] may enforce its [intellectual
property rights] with its [suppliers] is a different question from whether it acted in a fair and reasonable
manner when it interfered with its [suppliers'] contract with [the defendant] so as to force the [suppliers]
to disassociate with [the defendant]." *Id.*

and employees, it is the corporate entity that is legally responsible for those acts." *Id.* (citing *Ind.*

*Dep't of Pub. Welfare*, 523 N.E.2d at 1377).

> In the case of tortious interference with contracts:

> A party cannot "interfere" with its own contracts, so the tort itself can be committed
> only by a third party. In the case of a corporation, the legal entity acts through its
> directors and officers. Thus, when officers or directors act as agents of the
> corporation, they act not as individuals but as the corporation itself. In doing so,
> they are not acting as a third party to the contract and cannot be personally liable
> for tortious interference with a business relationship.

*Trail v. Boys and Girls Clubs of N.W. Ind.*, 845 N.E.2d 130, 138–39 (Ind. 2006). *See also Med.*

*Informatics Eng'g, Inc. v. Orthopaedics N.E., P.C.*, 458 F. Supp. 2d 716, 729 n.13 (N.D. Ind.

2006). "This reasoning applies equally to interference with a business relationship." *Blake-King*

*v. McDermott*, No. 2:13-CV-91, 2014 U.S. Dist. LEXIS 133064, at *10 (N.D. Ind. Sept. 23,

2014).

Zorin and Babenchik argue that all of the cases to which Baranay cites are factually

distinguishable because they do not include allegations that the agent of the corporation was

acting criminally or illegally. Moreover, Zorin and Babenchik find fault with Baranay's failure to

engage in the seven-factor *Winkler* analysis as to whether Baranay's conduct was justified. Zorin

and Babenchik cite to *Miller v. Ortman* for the proposition that "a defendant corporate

officer/director may be liable for tortious interference with his corporation's contract even if

there was some justification for his actions as long as he also engaged in unlawful acts." (Def.

Resp. Br. 7, ECF No. 188.) However, the alleged unlawful acts in *Miller* included "refusing to

fill orders from [the plaintiff] *already accepted* by the defendants," instructing the plaintiff's

buyers "to reorder directly with the [defendants]," and personally calling the plaintiff's buyers to

defame the plaintiff. 136 N.E.2d 17, 35–36 (Ind. 1956). Thus the unlawful actions that the

Indiana Court referenced were actions taken against the plaintiff. Here, Zorin and Babenchik argue only that it was ABRO's unlawful activities that motivated Baranay to terminate ABRO's relationship with Zorin and Babenchik, which was a lawful exercise of his authority.

Zorin and Babenchik also cite to *Winkler v. V.G. Reed & Sons, Inc.*, which cited to *Miller*, for the proposition that "Peter Baranay, as a corporate officer/President of ABRO may be held personally liable for actions even taken within the scope of this authority when he acted with intent to injure a third party" (Def. Resp. Br. 6). This proposition falls far from the holding in *Winkler*. What the Indiana Supreme Court actually stated was:

> [the corporate officer] correctly argues that he cannot be subject to personal liability for tortious interference with the contract because the uncontested evidence showed that he negotiated the asset purchase agreement as an officer of [the corporation], not in his individual capacity. A corporate officer is not liable for inducing the corporations' breach of its contract if the officer acts within the scope of his official duties on behalf of the corporation and not as an individual for his own advantage.

*Winkler*, 638 N.E. 2d 1228, 1234 n.7. The Indiana Supreme Court affirmed the Court of Appeals, which refused to find "[the president] individually liable because [the president's] actions were ones any corporate president could perform." *Id.* at 1231.

Subsequent authority confirms that corporate officers acting within the scope of their authority are not liable for a corporation's actions regardless of the officer's intent. For example, in *Leslie v. St. Vincent New Hope, Inc.*, the court found that so long as the defendant's actions were within the scope of her duties, the defendant's motives could not remove those actions from the scope of her duties. 873 F. Supp. 1250, 1255 (S.D. Ind. 1995). In coming to this conclusion, the *Leslie* court relied on *Martin v. Platt*, in which the court found no liability of officers acting within the scope of their duties, even when the discharge of those duties was "intentionally and maliciously done." 386 N.E.2d 1026, 1027 (Ind. Ct. App. 1979). Thus, "it seems clear from these

45

[Indiana] cases that . . . personal motives of an employee responsible for a tort are not sufficient by themselves to place the employee's actions outside the scope of his or her employment." 873 F. Supp. at 1256.

Zorin and Babenchik do not argue in their brief that Baranay's actions were outside of the scope of his authority. In fact, Zorin and Babenchik's third-party Complaint admits as much. (*See* Third Party Compl. ¶¶ 73, 75, ECF No. 24 (Baranay's actions were undertaken "on behalf of ABRO" and pursuant to Baranay's "authority as President of ABRO.").) Instead, Zorin and Babenchik focus on the argument that Baranay's motivation was improper. The fact remains that "[u]nder Indiana law, an officer or director acting within the scope of his professional duties for an entity, may not be held liable for inducing the breach of contract . . . that entity might have with [the complaining party]." *Hague v. Thompson Dist. Co.*, 1:02-CV-1744, 2005 U.S. Dist. LEXIS 7509 (S.D. Ind. Feb. 9, 2005). "[Baranay] was acting as the company's President and owner, with undisputed power" when he terminated the relationships between ABRO and Zorin and Babenchik and is therefore not personally liable for the disruption of those relationships. *Id.* Because Baranay cannot be liable, there is no need for the Court to consider whether his actions were justified. Therefore, Baranay is entitled to summary judgment on Zorin and Babenchik's claims for tortious interference.

## G. Motions to Strike

The Defendants filed a Motion to Strike ABRO Industries' Copyright Office Registration Certificates [ECF No. 204] and a Motion to Strike ABRO Industries' Expert Report on Damages [ECF No. 205]. As discussed above, both of these Motions are moot.

ABRO filed a Motion to Strike Portions of the Joint Declaration Submitted by Defendants [ECF No. 195]. However, the Court's analysis did not rely on the portions of the declaration that ABRO disputes, so this Motion is moot. ABRO also filed a Motion for Leave to File a Motion to Strike Declarations Filed by the 1NEW Defendants [ECF No. 212]. One of the declarations at issue purports to establish that Zorin and Babenchik were joint authors of the copyrighted works. The Court did not need to address this argument in coming to its conclusion. The other declaration at issue attacks ABRO's expert report and was filed in conjunction with the Defendants' Motion to Strike, which the Court has already found moot. Therefore, ABRO's Motion for Leave to File a Motion to Strike is denied.

## CONCLUSION

For these reasons, the Court GRANTS IN PART ABRO's Motion for Summary Judgment [ECF No. 166] as to Babenchik's tortious interference claim, DENIES IN PART ABRO's Motion for Summary Judgment as to the remainder of the Defendants' claims, GRANTS Baranay's Motion for Summary Judgment [ECF No. 168], and GRANTS the Defendants' Motion for Summary Judgment [ECF No. 175] and awards reasonable attorney's fees to the Defendants as to ABRO's copyright claim. Because the Court has granted summary judgment to Baranay, he will be DISMISSED from this action. All Motions to Strike [ECF Nos. 195, 204, and 205] are DENIED as MOOT. Likewise, ABRO's Motion for Leave to File a Motion to Strike [ECF No. 212] is DENIED.

SO ORDERED on October 30, 2017.

 s/ Theresa L. Springmann
CHIEF JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT